[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 285 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 286 
OPINION
 INTRODUCTION The California Supreme Court has transferred this case back to us with directions to vacate our original opinion filed April 24, 2007, and reconsider the cause in light of People v. Black (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] (Black II) and People v. Sandoval
(2007) 41 Cal.4th 825 [62 Cal.Rptr.3d 588, 161 P.3d 1146] (Sandoval). No supplemental brief has been timely filed following the transfer order. (Cal. Rules of Court, rule 8.200.) Those opinions require reconsideration of only one of the four issues raised on appeal. Our opinion otherwise remains the same. *Page 287 
 Defendant Michael Cedric Guess was tried on the following charges: pimping Emily, [1] a prostitute under the age of 16 (count 1; Pen. Code, § 266h, subd. (b)(2)[2]); pimping Dra., a prostitute under the age of 16 (count 2); aiding and abetting a forcible lewd act on Dra. (count 3; § 288, subd. (b)(1)), and possessing cocaine (count 4; Health Saf. Code, § 11350, subd. (a).) In the jury's absence, defendant admitted having served a prior prison term for possessing cocaine for sale. (§ 667.5, subd. (b).) When the jury, after deliberating, could not agree on count 1, the court declared a mistrial and later dismissed the charge on the prosecutor's motion. Defendant was acquitted of all other charges, but he was convicted of the lesser included offenses of attempting to pimp Dra. (§ 664) and abetting a lewd act on Dra. without force or duress.
 The court sentenced defendant to prison for nine years, consisting of the upper term of eight years for aiding and abetting a lewd act, enhanced by one year due to defendant's prison prior. The court also imposed the upper term for attempted pimping, and stayed it pursuant to section 654.[3]
 On appeal, defendant contends that he was prejudiced by the trial court's errors in denying his motion to continue the preliminary examination, admitting into evidence Dra.'s preliminary examination testimony and police interviews, and imposing the upper term sentence based on facts not found by the jury. Our prior opinion agreed with this last contention and reversed the judgment. Under the reasoning of BlackII, we will now affirm the judgment.
 TRIAL EVIDENCE On Friday, March 18, 2005, San Jose Police Officers Mario Brasil and Rick Galea conducted undercover surveillance in the parking lot of a San Jose shopping center known for prostitution. Automobiles were circling in the lot and some female pedestrians were having brief conversations with the occupants. About 10:00 p.m., the officers followed one of these females in their car. The female got into the right rear seat of defendant's car, which was parked in the lot. Also inside the car were defendant in the driver's seat, Emily in the front passenger's seat, and Dra. sitting behind defendant. In 45 minutes of surveillance the officers had not seen Emily or Dra. outside of the *Page 288 car, but for some of that time they watched and cited another female for prostitution. The officers got out of their car and spoke with the three girls, both separately and together.
 Defendant was wearing a white hat, white pants, a black sweatshirt, and he had a yellow ring on a yellow chain. He had a wallet but no cash. None of the girls had cash either.
 A search of defendant's car revealed over 50 pieces of paper listing "Lil Daddy" and a telephone number in the glove compartment, a cell phone with "Lil Daddy" on the screen, and a baggie containing a rock of 23 grams of cocaine under the driver's seat. A blood test of defendant was negative for any drugs.
 Defendant was arrested and transported to the police station. Officer Brasil interviewed him after defendant waived his rights. Defendant stated the following: He had driven down from Oakland and was waiting for his aunt when the girls came to his car. When asked if he was pimping the girls, he said he is or was a coke dealer. He has a 14-year-old daughter, so he would not pimp a girl that age. The name tags were for handing to girls, though he is married. Defendant denied that the cocaine was his. He had retired from that life. He does not use drugs.
 Emily refused to testify at trial, even under a grant of use immunity.
 Dra.'s First Interview
 Dra. was a runaway from her mother and from juvenile hall in Sacramento. She had cut off an ankle bracelet for electronic monitoring.
 On March 18, 2005, Officer Brasil spoke with Dra. in his car and recorded part of their conversation. The recording was in evidence at trial.[4] He told her she would not get in trouble if she cooperated.
 Dra. initially gave Brasil a false name, birth date, and high school. She also called Emily "Chloe." Officer Brasil did not believe she was as old as 17, as she claimed.
 Dra. told Officer Brasil the following. She was out "ho'ing" (whoring). It was her second day. Emily had gotten her started. She was working with *Page 289 defendant, whom she knew as "Mike." She did not consider him her pimp. The prior night, Thursday, she had given him $50, although he did not ask for anything. Thursday they were out until midnight. She made $60. She initially said she had one date that night. She first said it was $40 for oral sex, then said it was sex when Officer Brasil questioned her. She made another $20 by showing her breasts to another man. She spent Thursday night at defendant's place in Oakland. They slept in different rooms and did not have sex. She had not made any money on Friday night.
 Dra.'s Second Interview
 On April 1, 2005, Dra. was interviewed for over an hour in an interview room at the Sacramento Juvenile Hall by Elliott Beard, a law enforcement officer. It was against the hall policy for Officer Beard to bring in a tape recorder, so he took notes. Dra. was quiet and shy and did not maintain eye contact with Officer Beard. She told him the following: She left Sacramento because she had removed an ankle monitor. A friend took her to Oakland. While she was walking on the street, a car drove up containing Emily and Mike. Dra. knew Emily from Sacramento. She got into the car. Defendant said "let's go make some money." He asked Dra. to call him "Lil Daddy." He took them out and bought them some clothes. She got a short skirt and a tight shirt.
 Defendant drove Emily and Dra. to San Jose. Emily left the car and came back later with $200 that she said was for having sex with men.
 Dra. cried because she did not want to get out of the car and do the same thing. She thought defendant would hit her. She did get out of the car and have sex with one man for $40. She returned to defendant's car and gave him the money. She kissed his ring as he requested. When Emily returned to the car, they went to get something to eat and returned to Oakland. Emily gave defendant another $60.
 In Oakland, they stayed at defendant's house. In his house were other girls, who were selling drugs and "ho'ing."
 Officer Beard was initially confused about whether Dra. was describing one night or two. She said that they engaged in the same activity in San Jose the second night. Defendant gave her four condoms and told her to charge $80 for sex and $60 for "sucking . . . dick." Dra. tried unsuccessfully to get a "date." She went back to the car that night when she saw the police. Emily and defendant were in the car. Another prostitute came up to the car.
 At one point defendant yelled at Emily and raised his hand as if to strike her. He did not strike Emily or Dra. Officer Beard believed that this occurred on the second night. *Page 290 
 Dra. told Officer Beard that a man paid her $20 to look at her breasts. He did not include this statement in his report.
 Dra.'s Preliminary Examination
 The following parts of Dra.'s preliminary examination testimony were read to the jury.
 Dra. turned 13 in January 2005. Her home is in Sacramento. She was in juvenile hall because she ran away from home.
 On Thursday, March 17, 2005, she came to Oakland with a friend. As she was walking down a street, a car drove by and hailed her. Inside were Emily and defendant, who introduced himself as "Mike" or "Lil Daddy." Dra. knew Emily from Sacramento as a prostitute.
 Dra. got into the car to talk with Emily and because she had nowhere else to go. She had no money. Defendant offered them some food and drove them to a San Jose shopping center, where he bought them clothes. He did not tell her what clothes to get. Emily told her to get some heels, a skirt, and a T-shirt. He took them to "Auntie's" house where they changed. He brought them back to the shopping center in the early evening.
 At the shopping center, Emily got out of defendant's car at his suggestion. After a while she came back with some money. Dra. could not recall the amount. Defendant was wearing a ring. He told Emily to "get [her] lips wet." She kissed the ring and handed defendant the money. He said "you all go on. . . ."
 Emily and Dra. got out of his car. Defendant spoke to her on Emily's cell phone. He told her to ask people driving by if they wanted "panucha," which Emily said meant "vagina." Dra. went back to defendant's car. He said, "there's a whole bunch of tricks out there, go out there." Dra. did not know what "tricks" meant. She was afraid he might hit her, so she did. He did not hit her or Emily, but earlier that day he had yelled at Emily and raised his hand to her.
 Dra. had never done anything like this before. She stood by a telephone booth as defendant had instructed. Emily hailed a car and directed it to Dra. The driver asked her for "panucha." On Emily's cell phone, defendant told her, "you better get him." Dra. got into the car and had intercourse with the man for $80. She used a condom that Emily had given her.
 Dra. brought the money back to defendant in his car. At his request, she kissed his ring and gave him the money. Dra. at first said that she tried to get *Page 291 more money that night as defendant told her, but she failed. Men approached her, but she said she was not a prostitute.
 Dra. later recalled she had made another $20 the first night, for exposing her breasts to a man. She first asked him, as instructed by defendant, if he was the police. She gave defendant that money and kissed his ring again. After that, she told other men she was not a prostitute.
 When Emily returned, they went to get some food, because Dra. said she was hungry. They drove through a Jack in the Box. Defendant told them to get out because there were a lot of tricks around. After eating, they went to defendant's house in Oakland and spent the night. Other females were in the house.
 The next day Dra. slept until the evening. When she woke up, defendant told her to get dressed. He drove her and Emily back to the same San Jose shopping center. On the way they bought Dra. more heels because she was wearing tennis shoes. At one point Emily opened the glove box and a paper fell out with "Lil Daddy" and a telephone number listed. There were similar papers in the car.
 Dra. went back near the telephone booth. When men approached her, she told them she was not working, she was not a prostitute. She did not make any money the second night. Emily made money and gave it to defendant one time. Dra. could not tell how much.
 An older girl came and got into the car and warned them the police were coming. Defendant told Emily to hide her head. Emily said something about dope and told Dra. to hold something. Dra. told her she better hide it. She did not see what Emily did with the object.
 The police talked to all the girls the second night. Dra. initially lied about her name as defendant had instructed her. She eventually gave them her true name. She told them that defendant was not her pimp. She understood it was someone who makes people prostitutes. The police took her to a juvenile center.
 DENIAL OF MOTION TO CONTINUE PRELIMINARY EXAMINATION A. The Motion for Continuance
 A complaint filed March 23, 2005, charged defendant with two counts of pimping prostitutes under the age of 16, Emily (count 1) and Dra. (count 2), and with possessing cocaine (count 3). *Page 292 
 The preliminary examination was scheduled for Thursday, April 7, 2005. On that date, defendant filed a motion to continue the preliminary examination. Defense counsel declared that he had just, in the late afternoon on Tuesday, April 5, 2005, received tapes of police interviews of three victims. The tapes were hard to understand. The speakers were not identified. Sometimes two victims spoke at once. He did not have names or contact information for any victim. He would like the time to prepare a transcript, to identify the speakers, to review the police reports, and to interview the victims.
 At the outset of the preliminary hearing, defense counsel orally announced that he was not ready to proceed. The prosecutor objected to the continuance request, asserting the following: Though 13-year-old Dra. was in custody in Sacramento, she was present because the prosecutor had spoken to at least eight people in Sacramento and Santa Clara Counties to arrange for her transportation. Dra.'s mother had come from Sacramento to be a support person. It was a case where time was not waived. Dra. would like to return to Sacramento and take care of matters pending there.
 Defendant acknowledged it had been his request to proceed without waiving time. He said the matter still came up fairly quickly. Defendant said that he was now willing to waive time to allow counsel to prepare.
 The prosecutor responded that the tapes were short and were accurately described in the police reports. The prosecutor believed that defendant was willing to waive time and "pick a date in the future when I can't find his witnesses. . . ." The prosecutor was going to be out of the office the next two business days.
 The court stated: "As you can see[,] I'm not pleased [defense counsel]. I can read between the lines as to the time not waived and now there is a request for continuance when the victim was found at — because the DA made great efforts to locate her. [¶] And I was going to continue it to the tenth day but that is Monday and as I count it, you're not available on Monday." The prosecutor confirmed his unavailability. The court said, "I was going to suggest Tuesday, find good cause."
 The prosecutor argued as follows. It was a probable cause hearing and defense counsel could do an adequate job. "I will do a thorough job since this may be the only time I have to interview this witness." It would only take 90 minutes to examine the witness "sufficient for a probable cause hearing at a level that will preserve the defendant's constitutional rights." It would burden the families to have her stay over. It was not impossible. She would like to *Page 293 return to Sacramento the following day. She is in juvenile hall there and was a runaway to San Jose. If nothing else, the court could put the witness on and see if the issue arose later.
 The court ruled, "I am going to deny the motion. It is a preliminary examination."
 At one point during the preliminary examination, Dra. testified to an uncharged crime, that defendant had sex with her when they stayed overnight at his house. Defense counsel objected and renewed his request for a continuance. Dra. acknowledged that she had not told this to Officer Brasil, but said she did tell another man who came to Sacramento. Defense counsel objected that this was news to him and was why he wanted a continuance. It was not in the police reports or on the tapes as he understood them.
 The prosecutor responded that preliminary examinations were not for discovery purposes. It is common for new information to emerge in sexual assault cases.
 The court overruled the objection.
 Before cross-examining Dra., defendant renewed his request for a continuance. The court again denied the request. During the cross-examination of Dra., the prosecutor objected to only two questions, both for relevance, first if she knew she was being tape-recorded and second if she had engaged in similar activity before. The court sustained the first objection and overruled the second one.
 At the end of the hearing, defense counsel renewed his objection and the court denied it, saying the only surprise information was the sexual act in Oakland.
 B. Reviewing the Denial of the Motion for a Continuance
 Defendant contends that he was prejudiced because the trial court abused its discretion in denying his motion for a continuance.
 A trial court's ruling on a motion for a continuance is ordinarily reviewed for an abuse of discretion. (People v. Jenkins (2000)22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) However, because defendant claims an error at the preliminary examination, "Defendant may prevail in this claim only if he can demonstrate that the denial of a continuance before the preliminary hearing resulted in the denial of a fair trial or otherwise affected *Page 294 the ultimate judgment. (People v. Pompa-Ortiz [(1980)] 27 Cal.3d [519,] 529-530 [165 Cal.Rptr. 851, 612 P.2d 941]; [citation].)" (Id. at p. 958.)
 Section 859b provides in part: "Both the defendant and the people have the right to a preliminary examination at the earliest possible time, and unless both waive that right or good cause for a continuance is found as provided for in Section 1050, the preliminary examination shall be held within 10 court days of the date the defendant is arraigned or pleads. . . ."
 Section 1050, subdivision (g)(1) provides in part: "When deciding whether or not good cause for a continuance has been shown, the court shall consider the general convenience and prior commitments of all witnesses. . . ."
 Defendant claims that his counsel was unprepared to fully cross-examine Dra. at the preliminary hearing without having more time to listen to her taped interview and compare it to the police reports.
 The prosecutor asserted the inconvenience of having Dra. return from Sacramento in custody at a continued hearing. The court suggested some gamesmanship by defendant in changing his tune about a prompt preliminary examination when the prosecutor was able to obtain Dra.'s attendance. The court denied the motion, noting it was a preliminary examination.
 On appeal, defendant overstates his right to confront and cross-examine witnesses at a preliminary hearing. Without an adequate offer of proof, a defendant is not even entitled to call the victim to testify at the preliminary hearing. (People v. Eid (1994)31 Cal.App.4th 114, 127-128 [36 Cal.Rptr.2d 835].) As explained inWhitman v. Superior Court (1991) 54 Cal.3d 1063 [2 Cal.Rptr.2d 160,820 P.2d 262] (Whitman), the adoption of Proposition 115 in June 1990 drastically revamped procedures for the California preliminary examination. By constitutional and statutory amendments, hearsay can now establish probable cause to hold a charged person to answer. (Whitman,supra, 54 Cal.3d at p. 1070.) "Further, Penal Code section 866, subdivision (a), is amended to give the magistrate discretion to limit the defendant's right to call witnesses on the defendant's behalf. (`The magistrate shall not permit the testimony of any defense witness unless the offer of proof discloses to the satisfaction of the magistrate, in his or her discretion, that the testimony of that witness, if believed, would be reasonably likely to establish an affirmative defense, negate an element of a crime charged, or impeach the testimony of-a prosecution witness or the statement of a declarant testified to by a prosecution witness.') [¶] Finally, Penal [C]ode section 866, subdivision (b), explains that `It is the purpose of a preliminary examination to establish whether there exists probable cause to believe that the defendant has committed a felony. The examination shall not be used for purposes of discovery.'" (Id. at pp. 1070-1071.) *Page 295 
 In upholding this revised statutory scheme, the California Supreme Court indicated that a criminal defendant's state and federal rights of confrontation are not infringed by reliance on hearsay at the preliminary examination. (Whitman, supra, 54 Cal.3d at pp. 1076-1082.) "`The right to confrontation is basically a trial right.'" (Id. at p. 1079, quotingBarber v. Page (1968) 390 U.S. 719, 725 [20 L.Ed.2d 255, 88 S.Ct. 1318], italics omitted.) We will discuss more fully below defendant's separate contention that his right of confrontation at trial was infringed.
 Defendant suggests that his right of cross-examination at the preliminary hearing was enhanced in a case like this, where the victim was not expected to be available to testify at trial. The prosecutor announced an intent to "do a thorough job since this may be the only time I have to interview this witness." He suggests in these circumstances the preliminary hearing should be considered the trial.
 Defendant provides no authority for importing trial rights into a preliminary examination after passage of Proposition 115. We agree that a defendant should have a greater incentive to cross-examine a witness at a preliminary examination when the witness is expected to be unavailable at trial. (People v. Smith (2003) 30 Cal.4th 581, 611 [134 Cal.Rptr.2d 1,68 P.3d 302] [witness was returning to home country].) But a defense attorney is not disabled from meaningful cross-examination at a preliminary hearing because he or she does not have all known information about a witness. (Cf. People v. Cloyd (1997) 54 Cal.App.4th 1402, 1409
[64 Cal.Rptr.2d 104]; see People v. Harris (2005) 37 Cal.4th 310, 333 [33 Cal.Rptr.3d 509, 118 P.3d 545].) Counsel could have asked Dra. more about her conversations with police officers. The prosecutor did not object to the scope of the cross-examination.
 Considering all the circumstances, we conclude that the trial court did not abuse its discretion in denying defendant's motion to continue the preliminary examination. We also note that defendant's main claim of prejudice is that it "ultimately led to the court admitting [Dra.]'s preliminary hearing testimony into evidence." If her testimony was properly admitted, then defendant has not established any prejudice. As we explain in the next section, there was no error in admitting her preliminary examination testimony at trial.
 DEFENDANT'S RIGHT OF CONFRONTATION Defendant claims that the trial court erred in admitting any of Dra.'s pretrial statements at trial, including her preliminary examination testimony and her two police interviews.
 In advance of trial, the prosecutor moved to have Dra.'s preliminary examination testimony admitted into evidence on the basis she was unavailable as *Page 296 a witness. (Evid. Code, § 1291.) Defendant sought its exclusion on the basis that he had no meaningful opportunity to confront and cross-examine Dra. at the preliminary examination. His opportunity was truncated by the very nature of a preliminary examination and also because his attorney had no contact information for Dra. and only received a tape recording of her interview two days before the preliminary examination.
 These cross-motions were argued in advance of the trial. Defense counsel conceded that Dra. was unavailable to testify. The prosecutor said that he had opposed the continuance of the preliminary hearing partly because of his concern Dra. would flee, as she indeed had, again cutting off electronic monitoring. The key question was whether defendant had an opportunity to cross-examine her at the preliminary examination. Defendant argued that defense hands were already tied by the nature of the preliminary examination, since it cannot be used for discovery.
 The court determined to exclude Dra.'s surprise testimony about defendant having sex with her.[5] But relying on People v. Seijas
(2005) 36 Cal.4th 291 [30 Cal.Rptr.3d 493, 114 P.3d 742], among other cases, the court decided to admit into evidence the rest of her preliminary hearing testimony. Following this ruling, the parties agreed that Dra.'s police interviews could come in for impeachment.
 A. The Preliminary Examination Testimony
 On appeal, defendant argues that admission of Dra.'s pretrial statements violated Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford). As above, he asserts that his "counsel did not have a complete and adequate opportunity to cross-examine [Dra.]. Specifically, his late receipt of the taped statements precluded him from being able to fully prepare because he could not determine which statements on the tape were hers, or compare them against statements attributed to her in the police reports. This greatly hindered his ability to question her about her statements, or to bring out inconsistencies between her testimony and her prior statements, or between her statements and those of the other alleged victims."
 In Davis v. Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224,126 S.Ct. 2266, 2273], the United States Supreme Court explained: "InCrawford v. Washington, [supra,] 541 U.S. 36 . . ., we held that [the confrontation] provision bars `admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Page 297 
 In People v. Wilson (2005) 36 Cal.4th 309 [30 Cal.Rptr.3d 513,114 P.3d 758], the California Supreme Court stated at pages 340-341: "A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This right, however, is not absolute. The high court recently reaffirmed the long-standing exception that `[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' (Crawford v.Washington[, supra,] 541 U.S. 36, 59 . . .; see People v. Cromer (2001)24 Cal.4th 889, 892 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Evidence Code section 1291 codifies this traditional exception. (People v. Alcala[,supra,] 4 Cal.4th 742, 784-785. . . .) When the requirements of Evidence Code section 1291 are met, `admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]' (People v. Mayfield (1997) 14 Cal.4th 668, 742
[60 Cal.Rptr.2d 1, 928 P.2d 485].) [¶] Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is `unavailable as a witness,' and `[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'"
 The trial court properly relied on People v. Seijas, supra,36 Cal.4th 291 at page 303 as establishing that "The recent decision ofCrawford v. Washington[, supra,] 541 U.S. 36 . . ., although changing the law of confrontation in some respects, left these principles intact. `Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' (Id. at p. 59. . . .) `Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.' (Id. at p. 68. . . .)"
 Crawford does not make admissible prior testimony only where the opportunity for cross-examination has been effectively exercised. Peoplev. Carter (2005) 36 Cal.4th 1114 [32 Cal.Rptr.3d 759, 117 P.3d 476] stated at pages 1173-1174, "`as long as a defendant was provided theopportunity for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.' (People v. Samayoa [(1997)]15 Cal.4th 795, 851 [64 Cal.Rptr.2d 400, 938 P.2d 2], italics omitted; see also People v. Zapien (1993) 4 Cal.4th 929, 975 [17 Cal.Rptr.2d 122,846 P.2d 704]; People v. Alcala[, supra,] 4 Cal.4th 742, 784. . . .)" *Page 298 
 In light of this authority, we reject defendant's claim that he was unable to adequately confront Dra. at the preliminary examination.
 B. The Police Interviews
 Police interrogations often yield testimonial statements. (Crawford,supra, 541 U.S. at p. 68.) As clarified by Davis v. Washington, supra, 547 U.S. at pages ___ [126 S.Ct. 2266 at pages 2273-2274]: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." ([fn. omitted; cf.People v. Cage (2007) 40 Cal.4th 965, 982 [56 Cal.Rptr.3d 789,155 P.3d 205].)
 In this case defendant did not separately object to the admission of Dra.'s police interviews. Accordingly, this objection is waived on appeal. (People v. Carter (2003) 30 Cal.4th 1166, 1196,[fn. 6 [135 Cal.Rptr.2d 553, 70 P.3d 981].) Anticipating this conclusion, defendant further contends that it was constitutionally ineffective for his counsel to fail to make this objection.
 Defendant argues that he was prejudiced because counsel was unable to explore with Dra. her inconsistent statements. He overlooks that counsel made effective use of these interviews in his argument to the jury without having given her an opportunity to explain herself or resolve the inconsistencies. Counsel argued that Dra. was a liar. Counsel had compared her statements and found them inconsistent with each other and with other facts. She was inconsistent about how much Emily brought back to the car, when defendant said there were "tricks" outside, when defendant raised his hand in anger to Emily, how defendant first greeted her, and who gave her condoms. She did not tell Officer Beard she had exposed her breasts for $20. She said Emily had made money the second night, but there was none in the car.
 Defense counsel's argument was effective, considering that defendant was convicted only of lesser included offenses on two of the four charges. Under these circumstances, we conclude that defense counsel was not incompetent. He had a tactical reason for the admission of Dra.'s police interviews. (People v. Zapien, supra, 4 Cal.4th 929, 981.) In light of this conclusion, we need not consider whether admission of these interviews was prejudicial.
 IMPOSITION OF THE UPPER TERM On appeal defendant asserts that the court could not impose an upper term sentence based on factors not found by the jury beyond a reasonable doubt. *Page 299 
 The probation report in this case recommended imposition of the upper term. It reported, based on a conversation with a probation officer, that defendant was placed on five years of unsupervised felony probation in the County of Alameda on October 28, 2003, for possessing cocaine base for sale. According to a parole agent, defendant was also placed on parole in Sacramento on August 8, 2004, with a tentative discharge date of May 2, 2008. He had three prior felony convictions, two for possessing cocaine and one for recklessly evading a peace officer.
 At sentencing on December 29, 2005, the court imposed the upper term of eight years for aiding and abetting a lewd act, stating "there are many aggravators the court could rely on," any one of which would be sufficient to justify the upper term because there were no mitigating circumstances. The court mentioned the following: The victim was particularly vulnerable, not just because she was 13, but because she was in an unusually vulnerable situation. Defendant was in a position of leadership or dominance. The crime involved planning and sophistication. Defendant took advantage of a position of trust. Defendant was on probation and parole when the crime was committed. There was no objection to the court's reliance on these factors.
 On January 22, 2007, after the filing of the reply brief in this case,Cunningham v. California (2007) 549 U.S. ___ [166 L.Ed.2d 856,127 S.Ct. 856] (Cunningham), held that imposing an upper term pursuant to California's former determinate sentencing law (DSL)[6] violated the Sixth Amendment right to a jury trial, unless the sentencing court relied on (1) a fact found by a jury beyond a reasonable doubt, (2) a fact admitted by the defendant, or (3) a prior conviction. (Cunningham, at p. ___ [127 S.Ct. at p. 860]; cf. Black II, supra, 41 Cal.4th 799, 816.) In so doing, the court overruled People v. Black (2005) 35 Cal.4th 1238 [29 Cal.Rptr.3d 740, 113 P.3d 534] (Black I), vacated sub nom. Black v.California (2007) ___ U.S. ___ [167 L.Ed.2d 36, 127 S.Ct. 1210].
 The Attorney General contends that this argument is unavailable on appeal, because defendant did not make it in the trial court. The Attorney General relies on People v. Hill (2005) 131 Cal.App.4th 1089 [31 Cal.Rptr.3d 891] (Hill), which indicated that such a claim was forfeited by the defendant not making it shortly after the Blakely v.Washington (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (Blakely) decision was filed in 2004 and well before Black I was filed on June 20, 2005. (Hill, supra, *Page 300 131 Cal.App.4th at p. 1103.) In our case, it would have been futile after Black I to make this argument at sentencing, so we conclude it was not forfeited. (Sandoval, supra, 41 Cal.4th 825, 837,[fn. 4; cf. Peoplev. Welch (2003) 5 Cal.4th 228, 237-238 [19 Cal.Rptr.2d 520, 851 P.2d 802]; Civ. Code, § 3532.)
 Reaching the merits, it is clear that none of the aggravating factors cited by the court was charged or found by the jury or admitted by defendant.[7] While the jury found that Dra. was under the age of 16, this alone was not why the court considered her vulnerable. The jury was not asked to find if she was in particularly vulnerable circumstances.
 In this case, the trial court stated that it would have imposed the upper term based on any one of the aggravating factors by itself. One of those factors was that defendant was on probation or parole. It was permissible for the court to rely on this factor if it fits within the "prior conviction" exception.
 The "prior conviction" exception derives from Almendarez-Torres v.United States (1998) 523 U.S. 224 [140 L.Ed.2d 350, 118 S.Ct. 1219] (Almendarez-Torres). Almendarez-Torres confronted the issue whether a provision in a federal statute prohibiting the return of a deported alien "defines a separate crime or simply authorizes an enhanced penalty." (Id. at p. 226.) The maximum prison term for returning was two years, unless the deportation followed a conviction of an aggravated felony, in which case the maximum prison term was 20 years. (Ibid.) The court realized that the provision, unlike the minimum sentence requirement inMcMillan v. Pennsylvania (1986) 477 U.S. 79 [91 L.Ed.2d 67,106 S.Ct. 2411], altered the maximum penalty for the crime. (Almendarez-Torres, supra, at p. 243.) But the court found no constitutional significance in this difference, explaining that "the sentencing factor at issue here — recidivism — is a traditional, if not the most traditional basis for a sentencing court's increasing an offender's sentence." (Ibid.) There is a long-standing tradition that recidivism is not an element, but goes only to the punishment. (Id. at p. 244.) The court concluded that recidivism was not an element of the offense. (Id. at p. 247.) The court noted that there was no standard of proof claim "because he admitted his recidivism at the time he pleaded guilty. . . ." (Id. at p. 248.) *Page 301 
 Four justices (Scalia, Stevens, Souter, and Ginsburg) dissented, concluding that it was a matter of serious doubt whether "the Constitution requires the recidivism finding in this case to be made by a jury beyond a reasonable doubt. . . ." (Almendarez-Torres, supra,523 U.S. at p. 260 (dis. opn. of Scalia, J.).) To avoid this potential constitutional problem, the dissent would have construed the federal statute "as establishing a separate offense rather than a sentence enhancement." (Id. at p. 270 (dis. opn. of Scalia, J.).)
 Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435,120 S.Ct. 2348] (Apprendi) described Almendarez-Torres as "at best an exceptional departure from the historic practice" of having a jury determine the facts necessary for sentencing. (Apprendi, supra,530 U.S. at p. 487.) Apprendi characterized Almendarez-Torres as based partly on the defendant having "admitted the three earlier convictions for aggravated felonies — all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own. . . ." (Id. at p. 488.) Apprendi stated, "Even though it is arguable thatAlmendarez-Torres was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested, Apprendi does not contest the decision's validity and we need not revisit it for purposes of our decision today to treat the case as a narrow exception to the general rule" that the court applied. (Id. at pp. 489-490,[fn. omitted.)
 We note that the Apprendi and Blakely majorities consisted of Justices Stevens, Scalia, Souter, Ginsburg, and Thomas. These justices, joined by new Chief Justice Roberts, were the majority in Cunningham. A concurrence by Justice Thomas in Apprendi explained, "one of the chief errors ofAlmendarez-Torres — an error to which I succumbed — was to attempt to discern whether a particular fact is traditionally (or typically) a basis for a sentencing court to increase the offender's sentence. [Citations.] . . . [T]his approach just defines away the real issue. What matters is the way by which a fact enters into the sentence." (Apprendi, supra,530 U.S. at pp. 520-521 (cone. opn. of Thomas, J.).) It is questionable whether a majority of the current United States Supreme Court supports this exception.
 In Black II, the California Supreme Court rejected what it considered a narrow reading of this exception as follows: "(See People v. McGee (2006)38 Cal.4th 682 [42 Cal.Rptr.3d 899, 133 P.3d 1054] (McGee) [defendant not entitled to have a jury determine whether his prior conviction in Nevada qualified as a serious felony for the purpose of imposing a sentence enhancement]; see also People v. Thomas (2001)91 Cal.App.4th 212, 220-223 [110 Cal.Rptr.2d 571] [the exception recognized in Apprendi for `"the fact of a prior conviction"' permits a trial court to decide whether a defendant has served a prior prison term].) As we recognized in McGee, numerous decisions *Page 302 from other jurisdictions have interpreted the Almendarez-Torres exception to include not only the fact that a prior conviction occurred, but also other related issues that may be determined by examining the records of the prior convictions. (See cases cited in McGee, supra,38 Cal.4th at pp. 703-706; see also U.S. v. Smith (6th Cir. 2007)474 F.3d 888, 892 [no right to a jury trial concerning the circumstance whether defendant's criminal history was `"extensive and egregious"'].)
 "The determinations whether a defendant has suffered prior convictions, and whether those convictions are `numerous or of increasing seriousness' (Cal. Rules of Court, rule 4.421(b)(2)), require consideration of only the number, dates, and offenses of the prior convictions alleged. The relative seriousness of these alleged convictions may be determined simply by reference to the range of punishment provided by statute for each offense. This type of determination is `quite different from the resolution of issues submitted to a jury, and is one more typically and appropriately undertaken by a court.' (McGee, supra, 38 Cal.4th at p. 706.)" (Black II, supra,41 Cal.4th 799, 819-820,[fn. omitted.)
 It is the opinion of the Second District Court of Appeal (Div. 6) that a defendant's "status as a parolee and his prior unsatisfactory performance on parole . . . can be determined by reference to `court records' pertaining to [his] prior convictions, sentences and paroles." (People v. Yim (2007) 152 Cal.App.4th 366, 371 [60 Cal.Rptr.3d 887].) Though this opinion predated Black II by almost one month, it is consistent with its rationale.
 We recognize that the Board of Parole Hearings (Board) is required to notify the sentencing court when it is considering the parole suitability of an inmate serving an indeterminate term. (§ 3042, subd. (a).) We are not familiar with any statute requiring written notice to the sentencing court of the Board's ultimate parole suitability decision or notice to the court of the automatic release on parole of some inmates serving determinate sentences. (See § 3000.)
 Whether or not a criminal defendant's parole status may readily appear by examining the records of prior convictions, the probation status does so appear, because it results from a court order. In this case, defendant's status as being "on probation" fits within the broad construction of "prior conviction" given by Black II. Accordingly, since the sentencing judge properly relied on this factor as justifying the upper term, defendant has no complaint that the trial court also invoked other aggravating factors not found by a jury. (Black II, supra,41 Cal.4th 799, 815.) *Page 303 
 DISPOSITION The original opinion filed April 24, 2007, is vacated. The judgment is affirmed. The trial court is directed to modify the abstract of judgment to reflect a stayed upper term on count 2 and to send the modified abstract to the Department of Corrections and Rehabilitation.
 Premo, J., and Elia, J., concurred.
[1] Surnames are omitted out of respect for privacy.
[2] Unspecified section references are to the Penal Code.
[3]The abstract of judgment erroneously reflects that the court imposed a stayed midterm sentence on count two. While this is what the court initially stated at sentencing, at the prosecutor's request, the court changed it to staying the upper term.
[4]A transcript of this conversation is five pages long, with a number of words inaudible.
[5]As a result of this ruling, the prosecutor dismissed a charge that was based on this testimony.
[6]Section 1170, subdivision (b) was amended effective March 30, 2007, to confer discretion on sentencing courts to impose upper, middle, or lower terms.
[7]While defendant admitted having served a prior prison term, the court relied on this fact to impose a one-year sentence enhancement. Section 1170, subdivision (b) prohibits imposing "an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." *Page 304