[No. S123790. July 7, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY SEIJAS, Defendant and Appellant.

COUNSEL

Flier and Flier, A. William Bartz, Jr., and Andrew Reed Flier for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Donald E. De Nicola, Margaret E. Maxwell, Deborah J. Chuang and Jason C. Tran, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—In this case, a witness against defendant admitted at the preliminary hearing that he had originally lied to the police about the identity of defendant's accomplice. Because of this, shortly before trial began, defendant's counsel suggested that the trial court should appoint an attorney to advise that witness whether to assert the privilege against self-incrimination. The court did so. When the witness did assert the privilege, defense counsel argued that the witness should be given immunity for his testimony. Counsel also argued that if the witness were granted immunity, defendant could cite that immunity to challenge the witness's credibility before the jury. The prosecution refused to give the witness immunity. As a result, the court permitted the witness to assert the privilege. Ultimately, it declared the witness unavailable to testify at trial and admitted his preliminary hearing testimony.

The Court of Appeal held that the trial court erred in permitting the witness to assert the privilege against self-incrimination and, for this reason, prejudicially erred in admitting the preliminary hearing testimony. We conclude that because defendant did not object on this ground at trial, this issue is not cognizable on appeal. Moreover, the argument lacks merit, as the court properly permitted the witness to assert the privilege given the unusual facts of the case.

## I. FACTS AND PROCEDURAL HISTORY

A jury convicted defendant, Larry Seijas, of the second degree murder of Heriberto Salinas, who died of three gunshot wounds inflicted on March 26, 2001.

Among the witnesses who implicated defendant in the crime was 13-year-old Jonathan G. At the preliminary hearing, Jonathan testified that he was riding his skateboard to the market when defendant offered him a ride. Tony

Gonzalez was sitting in the front passenger seat, so Jonathan got into the backseat. As they drove towards the market, Jonathan saw defendant and Gonzalez passing a gun between them. Defendant stopped at the market. The victim, Salinas, was driving out of the market parking lot in his pickup truck. Salinas pulled around and stopped on the driver's side of defendant's car. Jonathan got out of defendant's car and started walking toward a nearby alley. From the alley, Jonathan saw defendant standing in the street between his car and Salinas's truck. Salinas was sitting in his truck. Jonathan saw defendant shoot Salinas, then get back in his car and drive away.

On cross-examination, Jonathan admitted that at first he told the police that he did not see anything regarding the shooting. Then, when he did tell the police about what he saw, he lied about who had been in defendant's car. He originally said that Danny Ellis was with defendant, when in fact it was Tony Gonzalez. He falsely identified Ellis because he disliked him. The police arrested Ellis in this matter based on Jonathan's information, then later released him when they learned that Jonathan had lied.

At trial, Jonathan asserted the right against self-incrimination, and the court admitted his preliminary hearing testimony. The question whether Jonathan might incriminate himself first arose on the record at a pretrial hearing when the court asked the parties what was "the situation with [Jonathan] and his potential viability as a criminal suspect for anything?" The deputy district attorney prosecuting the case said that defense counsel had first raised the question whether Jonathan should have an attorney to advise him regarding the privilege against self-incrimination. The prosecutor said that defense counsel said "something to me on Friday that he might ask for an attorney. Frankly, that's the first I've heard of it. I suppose that [Jonathan will] be put in a position where he has to say that yes, he wrongfully accused Mr. Ellis. And that, I guess, is a misdemeanor. So I suppose an attorney should talk to him. Obviously, we're not going to file any charges on that." At this point, defense counsel did not expressly agree or disagree with this statement, but his later comments, discussed below, support the prosecutor's statement that counsel had first suggested that Jonathan should have an attorney to protect his rights. The court asked the prosecutor whether he would give Jonathan immunity. He responded, "I'm sure we would. I have to get that approved." The court asked him to "deal with that" promptly. It also arranged to have an attorney appointed for Jonathan.

This topic next arose on the record after the jury was selected. At this point, the prosecutor stated he did *not* think his office would give Jonathan immunity, and that he would seek to have Jonathan declared unavailable and use his preliminary hearing testimony. Defense counsel stated, "[I]f the government does not . . . give [Jonathan] immunity, then there's going to be a

very big issue about the unavailability issue." The court expressed concern: "I think the issue is whether or not the district attorney's office, in good faith, is creating a 5th Amendment issue if the district attorney's office doesn't believe that [Jonathan] was involved in this murder and is merely somebody who was in the back seat of a car who would properly be given immunity. But you [the prosecutor] may be concerned about his wishy-washiness on the stand and would prefer his preliminary hearing transcript to come in."

The prosecutor said he was reluctant to grant Jonathan immunity for either the charged murder or filing a false police report, which he believed might be a misdemeanor violation of Penal Code section 148.5. He explained the reasons: "The issue is once we start giving immunity, then the defense gets up here in closing arguments and is accusing us of buying witnesses and immunizing them and so on. It has a prejudicial effect. Most jurors do not like immunized witnesses and are likely to disregard what they have to say once they've been given immunity."

At the next hearing, the parties again discussed the question of immunity. The court asked the prosecutor for a final answer on whether he would grant Jonathan immunity. He responded that he had spoken with his supervisor, and they agreed that they did not want to offer immunity. He also said it was unlikely that Jonathan would be prosecuted for any role in the murder because the prosecution had no evidence implicating Jonathan in the murder. Indeed, an independent witness had provided information that he was not involved. He also did not believe it likely Jonathan would be prosecuted for making a false statement to a police officer: "Arguably it can be claimed that perhaps when he . . . accused Mr. Ellis, that was a misdemeanor possibly. I looked at the law and the annotations last night. It's not 100 percent clear to me that that's the case. But it's always possible. But I wouldn't be recommending it." He said that it had not occurred to him to prosecute Jonathan until defense counsel raised the question.

The court summarized the situation as it saw it: "We have a district attorney's office who is intending not to exercise their discretion and give immunity to [Jonathan]. The subject, however, would not have come up if [defense counsel] would not have made the initial request for [Jonathan] to have an attorney. So now [defense counsel] is faced with the consequences of requesting this attorney, which is that he's going to exercise his 5th Amendment privilege. [Defense counsel] is now going to object because he doesn't want a preliminary hearing transcript to be used." At that point, an attorney arrived to represent Jonathan. This attorney and the court ascertained that the district attorney was not willing to give Jonathan immunity.

The prosecutor explained his position further: "Our position is that . . . there is no authority that forces us to grant immunity. It's something that's in

our discretion. And it's our belief, the D.A.'s office, that the community and jurors and generally defense counsel don't appreciate when we use that discretion. . . . [I]n the past administration it was very perfunctory. We'd write our memo, and immunity would be granted every single instance in the last four years. . . . [W]ith the new administration, they're being very reluctant to grant it." The court expressed concern about the district attorney's attitude: "We have a witness who is critical to the People's case. And in the interest of justice, the jury would have a much better sense of who [Jonathan] is and whether or not they want to believe him or think he's just a stupid, mixed-up kid or whatever if they have an opportunity to observe his demeanor. And so what you're . . . saying is based on really . . . not credible reasons other than you just don't want him in front of the jury." The court wondered why the prosecutor would not grant immunity in light of the fact he did not believe Jonathan was involved in the murder or that Jonathan would be prosecuted for giving false information.

The prosecutor explained his reasons further: "The most basic concern is the one that I have in every case where I'm forced to offer immunity. This happens all the time. You talk with defense attorneys, 'Oh, you better get the witness immunity because I'm going to ask for a lawyer to come in.' So then we have to now immunize them in a case where we never intended on prosecuting, just like this case, just like what [defense counsel] did now. All of a sudden, we give immunity and . . . defense attorneys get up in opening statements, closing argument and cross-examination, and they intimate that the People of the State of California, that the prosecution is buying witnesses to the grant of immunity, that the only reason that [Jonathan] is coming forward in this case is because he's now been granted immunity from these crimes, which is, of course, ridiculous in this case as we did in all other cases where we had no intention to immunize." The court responded that it was "not only ridiculous, it would be improper for [defense counsel] to make that argument. I won't allow him to make the argument. It would be contrary from what we know the facts to be. We know [defense counsel] is the person who asked to have this witness be given immunity. That is something the jury can find out about if for some reason he tries to intimate that something else has occurred. So that . . . should not be a concern of yours."

Defense counsel objected to the court's "influencing potentially the district attorney's decision about immunity . . . . I don't think it's proper whether the court believes it's ridiculous or not. That's not the issue. That's why we have a jury. And I think it's highly improper by the court to do exactly what the court is doing. . . . Whether it's the court giving an advisory opinion or not, I find it very improper to say that [I] can't have it both ways. I can have it both ways because . . . every witness has the potentiality of incriminating himself. And the record is clear. That's exactly what [Jonathan] potentially is doing. So it's not just a ploy by the defense to try to buy time or . . . argue that the

prosecutor is buying witnesses. He has rights, and they should be protected. And the court should see that they are protected adequately. The court should not be saying this is an inconvenience issue and doesn't make sense to the court why, on a little misdemeanor, but the court doesn't know the facts." He added that there "was evidence that [Jonathan] potentially was the shooter. I think [Jonathan's attorney] should know that. It's in the murder book. . . . [T]here's information in the murder book that word on the street is that a little kid [was] with the shooting and was trying to get jumped into the gang and make a name of himself. So if you ask me on the record is this some little tactic by the defense, I think that's wrong. . . . [W]hat I really don't like is that the district attorney's office I think is playing games. We want it both ways. We want the jury to hear that they're not giving him immunity even though they have whatever discretionary call they have. But at the same time, 'We're not buying witnesses.' " He also said that he was "here to protect the record as to Mr. Seijas. But I'm also here to make sure that [Jonathan] isn't thrown to the wolves."

The prosecutor responded. He said he did not make the final decision on whether to prosecute someone. He also said that as far as he knew, defendant himself had "told some people that it was a minor who was involved, and that's where that rumor started." He said that if the defense's position was that Jonathan was involved in the murder, "that changes the stakes entirely. And if they're going to argue to the jury that now we are protecting [Jonathan] and buying him from this murder case in order to prosecute [defendant], that gravitates much further in the direction of not offering immunity with that kind of argument." He added that when the court said it might prevent the defense "from talking about the immunity issue, . . . my perspective changed almost entirely. I was going to go call my supervisor and rediscuss the issue with her. If the defense can't claim that we bought this witness through immunity, then that changes everything. And I agree with the court that the argument seemed to appear stronger at that point to put [Jonathan] on the stand and let the jury judge him . . . . But if now, based on these hearsay rumors that I believe were started by the defendant and his fellow gang members, that there's an argument that he could be held responsible for the murder, that makes it even that much more important that we not be accused of buying this witness. But in any event, [defense counsel's] position is that he will, if [Jonathan] testifies, bring up the fact of this immunity and impeach him on it, then my position will not change on that."

The court noted that defendant would be entitled to argue to the jury any immunity Jonathan received, but it would not permit defense counsel "to argue something that would not be correct as we know it," including that any immunity was "the district attorney's idea." Defense counsel said that he had raised the question of immunity only to protect Jonathan's rights.

At the next court hearing, Jonathan's attorney informed the court that she was advising him to assert the privilege against self-incrimination unless the prosecution gave him immunity. The prosecutor reiterated that the prosecution would not give Jonathan immunity. Jonathan was then sworn as a witness out of the presence of the jury, and he did assert the privilege. The court asked Jonathan's attorney whether, in her "professional judgment and as an officer of the court," she believed Jonathan was validly exercising the privilege. She said she did so believe. The court stated that Jonathan may have committed the misdemeanor of making a false statement to a police officer under Penal Code section 148.5 and possibly was liable as an accessory under Penal Code section 32.

At this point, the prosecutor suggested he might be willing to give Jonathan immunity for a crime under Penal Code section 148.5 and possibly also Penal Code section 32. He asked "if the defense position is would he be willing to testify if we offered him immunity on strictly the 148.5 and maybe the court's position on the 32 P.C. or is she—is their position that the 5th Amendment right is extending to the murder?" Defense counsel said, "The issue is he said he's taking his 5th. That's it. I have no other questions to ask with respect to [Jonathan]." The prosecutor again asked whether Jonathan would be willing to testify if he received immunity for a Penal Code section 148.5 charge. Defense counsel (and not Jonathan's attorney) responded, "I have read the entire preliminary hearing transcript, and I've discussed it at length, and no. No. The answer is no." The prosecutor said that immunizing Jonathan for the murder "complicates things a lot more for us." He also discussed Jonathan's personal situation regarding gang members and believed that Jonathan would be better off if the members heard that he had refused to testify. Ultimately, he did not offer to grant any immunity to Jonathan.

The court found Jonathan "unavailable as a witness in this case in that upon advice of counsel he has testified under oath that he would exercise his privilege under the 5th Amendment." Then, over defendant's objection on grounds unrelated to whether the court should have permitted Jonathan to assert the privilege, the court admitted Jonathan's preliminary hearing testimony at trial.

After conviction and sentencing, defendant appealed. The Court of Appeal held that the trial court erred in permitting Jonathan to assert the privilege against self-incrimination. Accordingly, it concluded that the trial court's declaring Jonathan unavailable and admitting his preliminary hearing testimony denied defendant his constitutional right to confront witnesses. The court found the error in admitting the preliminary hearing testimony prejudicial and reversed the judgment.

We granted the Attorney General's petition for review.

## II. Discussion

A. *Whether the issue regarding the trial court's permitting the witness to assert the privilege against self-incrimination is cognizable on appeal*

The Court of Appeal reversed the judgment because it found that the trial court erred in permitting Jonathan to assert the privilege against self-incrimination and, for this reason, also erred prejudicially in admitting his preliminary hearing testimony. Originally, defendant did not argue the trial court erred in this regard but did so only after the Court of Appeal raised the issue on its own motion and solicited briefing from the parties. That defendant did not himself "raise the issue on appeal is understandable. He was precluded from doing so by his failure to preserve the point by appropriate objection in the trial court . . . ." (*People v. Rogers* (1978) 21 Cal.3d 542, 547 [146 Cal.Rptr. 732, 579 P.2d 1048].)

Defense counsel originally suggested that the court should appoint an attorney to advise Jonathan regarding the privilege against self-incrimination. Moreover, even after the court did appoint an attorney for Jonathan, defense counsel argued that Jonathan had to be given immunity. He also argued that he could cite any immunity to challenge Jonathan's credibility in front of the jury. Indeed, he said that Jonathan's attorney should know that there was evidence implicating Jonathan in the murder itself. Later, even though Jonathan was represented by his own attorney, defense counsel answered a question from the district attorney by saying that Jonathan would not testify unless immunized for the murder as well as for a violation of Penal Code section 148.5. Implicit in all of these statements was that Jonathan's testimony would be self-incriminating. Defendant never objected to the court's permitting Jonathan to assert the privilege.

We have long held that a party who does not object to a ruling generally forfeits the right to complain of that ruling on appeal. (E.g., *People v. Simon* (2001) 25 Cal.4th 1082, 1103 [108 Cal.Rptr.2d 385, 25 P.3d 598], and cases cited.) Specifically, a defendant who fails to object to a court's permitting a witness to assert the privilege against self-incrimination may not challenge the ruling on appeal. (*People v. Malone* (1988) 47 Cal.3d 1, 34–35 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People v. Dimitrov* (1995) 33 Cal.App.4th 18, 31–32 [39 Cal.Rptr.2d 257].) This bar "is but an application of the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. (See Evid. Code, § 353 . . . .)" (*People v. Rogers, supra,* 21 Cal.3d at p. 548.)

■ Defendant argues that he did object at trial to admitting Jonathan's preliminary hearing testimony. He did do so, but on different grounds. He never objected to the trial court's permitting Jonathan to assert the privilege. The grounds on which defendant did object, which are not before us on review, are not forfeited, but this particular ground is. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .*" (Evid. Code, § 353, italics added.) In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. (*People v. Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468] [objection on ground that questions were leading does not preserve appellate argument that the evidence was impermissible evidence of other crimes]; see also *People v. Rogers, supra,* 21 Cal.3d at pp. 547–548.)

■ Defendant also argues that Penal Code section 1259 permits him to raise this question. It does not. That section provides: "Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review *any question* of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done *after objection* made in and considered by the lower court, and which affected the substantial rights of the defendant. The appellate court may also review *any instruction* given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Italics added.) This section distinguishes claims of instructional error, which may be asserted even without objection if they affect the defendant's substantial rights, from other claims of error, which require a trial objection. (See, e.g., *People v. Hillhouse* (2002) 27 Cal.4th 469, 505–506 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

Defendant also argues that his attorney was acting in his general capacity as an officer of the court, and not in his capacity as defense counsel, when he suggested the court appoint an attorney to represent Jonathan and argued that Jonathan was entitled to immunity. He may have been so acting when he originally suggested the court appoint counsel for Jonathan (a point we need not consider in detail). Simply suggesting that the witness might need an attorney did not cause this claim to be forfeited. Rather it was defendant's failure *ever* to object on this ground that makes it not cognizable on appeal.

The issue that the Court of Appeal addressed "may not, for the reason stated, be reviewed in this appeal." (*People v. Rogers, supra,* 21 Cal.3d at p. 548.) Moreover, as we explain, even if the issue were reviewable, we would find no error under the specific facts that confronted the trial court.

    B.   *Whether the trial court erred in permitting Jonathan to assert the privilege against self-incrimination*

    1.   *Background*

■   Although defendants generally have the right to confront their accusers at trial, this right is not absolute. "If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial." (*People v. Smith* (2003) 30 Cal.4th 581, 609 [134 Cal.Rptr.2d 1, 68 P.3d 302]; see Evid. Code, § 1291, subd. (a).) The defendant "must not only have had the *opportunity* to cross-examine the witness at the previous hearing, he must also have had 'an interest and motive similar to that which he has at the [subsequent] hearing.'" (*People v. Smith, supra,* at p. 611.) Under these rules, "we have routinely allowed admission of the preliminary hearing testimony of an unavailable witness." (*Ibid.*) The recent decision of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], although changing the law of confrontation in some respects, left these principles intact. "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id.* at p. 59.) "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (*Id.* at p. 68.)

A witness who successfully asserts the privilege against self-incrimination is unavailable to testify for these purposes. (*People v. Malone, supra,* 47 Cal.3d at p. 23; Evid. Code, § 240, subd. (a)(1).) Moreover, the fact that Jonathan failed to assert the privilege at the preliminary hearing does not prevent him from asserting it at trial. (*People v. Malone, supra,* at p. 23; *Overend v. Superior Court* (1900) 131 Cal. 280, 284 [63 P. 372]; *People v. Maxwell* (1979) 94 Cal.App.3d 562, 570–571 [156 Cal.Rptr. 630].) However, "[t]o be found unavailable on this ground, a witness must not only intend to assert the privilege, but also be entitled to assert it." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [25 Cal.Rptr.2d 390, 863 P.2d 635].) The Court of Appeal held that the trial court erred in finding Jonathan entitled to assert the privilege and, for this reason, reversed the judgment.

■ We have never specifically stated the standard of review of a court's ruling on a witness's assertion of the privilege. We review deferentially the trial court's resolution of any factual disputes. (*People v. Cromer* (2001) 24 Cal.4th 889, 894 [103 Cal.Rptr.2d 23, 15 P.3d 243].) The Attorney General argues that a similar deferential standard applies to the ultimate ruling that the witness may assert the privilege. We disagree, at least when the ruling affects a defendant's right to confront witnesses. When, as here, the relevant facts are undisputed, an appellate court should review independently the trial court's ruling permitting the witness to assert the privilege. In *People v. Cromer*, we considered the closely similar question how an appellate court should review a trial court's finding that the prosecution exercised due diligence to locate a missing witness. We found the proper standard to be "independent, de novo, review rather than the more deferential abuse of discretion test." (*Id.* at p. 893.) Much of *Cromer*'s reasoning applies here. One of the reasons we gave is that independent review "comports with this court's usual practice for review of mixed question determinations affecting constitutional rights." (*Id.* at p. 901.) Here, as in *Cromer*, the ruling we are reviewing affects the constitutional right of confrontation. (*Id.* at p. 896.) We conclude that the independent standard of review we applied in *Cromer* to a finding of due diligence also applies to a finding that the witness could assert the privilege against self-incrimination.

### 2. *Review of the trial court's ruling*

■ It is a bedrock principle of American (and California) law, embedded in various state and federal constitutional and statutory provisions, that witnesses may not be compelled to incriminate themselves. In an oft-cited case, the high court stated that this privilege "must be accorded liberal construction in favor of the right it was intended to secure." (*Hoffman v. United States* (1951) 341 U.S. 479, 486 [95 L.Ed. 1118, 71 S.Ct. 814].) A witness may assert the privilege who has "reasonable cause to apprehend danger from a direct answer." (*Ibid.*; accord, *Ohio v. Reiner* (2001) 532 U.S. 17, 21 [149 L.Ed.2d 158, 121 S.Ct. 1252].) However, "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination." (*Hoffman v. United States, supra*, at p. 486.) The court may require the witness "to answer if 'it clearly appears to the court that he is mistaken.' " (*Ibid.*) "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (*Id.* at pp. 486–487.) To deny an assertion of the privilege, "the judge must be ' "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have

such tendency" to incriminate.' " (*Malloy v. Hogan* (1964) 378 U.S. 1, 12 [12 L.Ed.2d 653, 84 S.Ct. 1489], quoting *Hoffman v. United States, supra,* at p. 488.)

California's Evidence Code states the test broadly in favor of the privilege: "Whenever the proffered evidence is claimed to be privileged under Section 940 [the privilege against self-incrimination], the person claiming the privilege has the burden of showing that the proffered evidence might tend to incriminate him; and the proffered evidence is inadmissible unless it *clearly appears* to the court that the proffered evidence *cannot possibly have a tendency* to incriminate the person claiming the privilege." (Evid. Code, § 404, italics added.) We have said that this section incorporates the standard of *Hoffman v. United States, supra,* 341 U.S. 479. (*People v. Ford* (1988) 45 Cal.3d 431, 441–442 [247 Cal.Rptr. 121, 754 P.2d 168]; see also *People v. Cudjo, supra,* 6 Cal.4th at p. 617.)

Applying these standards, we conclude the trial court correctly permitted Jonathan to assert the privilege under the circumstances. The Court of Appeal gave two reasons for finding Jonathan should have been forced to testify, neither convincing.

██ The court said that "the prosecutor repeatedly assured the trial court the People had no intention of prosecuting Jonathan for the murder or for giving the police false information about the murder. Given these recurrent representations to the court, Jonathan could not have reasonably feared prosecution for falsely identifying Ellis as the killer." Although we agree that, on this record, an actual prosecution appears to have been unlikely, the privilege against self-incrimination does not require, or even permit, the court to assess the likelihood of an actual prosecution in deciding whether to permit the privilege. The court may not force a witness to make incriminating statements simply because it believes an actual prosecution is unlikely. The test is whether the statement might tend to incriminate, not whether it might tend to lead to an actual prosecution or, stated slightly differently, whether the statement *could*, not *would*, be used against the witness. (See Evid. Code, § 404.) Forcing a witness to make incriminating statements whenever the court feels that actual prosecution is unlikely would impermissibly weaken the privilege against self-incrimination. Use of incriminating statements must be *forbidden*, as by a grant of immunity, and not merely *unlikely*, before the court may force a witness to make them.

The second reason the Court of Appeal gave that Jonathan would not incriminate himself is that "California does not recognize 'lying to the police' as a crime." It concluded that Penal Code section 148.5 (section 148.5) "applies to the false reporting of a crime, not false statements to the police in

the course of their investigation of a crime," and it found that Jonathan had not violated any other criminal provision, including Penal Code section 148 (section 148). We do not have to decide definitively whether Jonathan committed a crime in his original lie to the police. The issue is not whether the testimony *does* incriminate but whether it *tends* to do so, or, as the high court phrased it, whether Jonathan had reasonable cause to apprehend *danger* from the testimony. (*Hoffman v. United States, supra,* 341 U.S. at p. 486.) Under the unusual circumstances of this case, including the fact that all parties—the prosecution, Jonathan's own attorney, and defense counsel—believed that Jonathan's testimony might be self-incriminating, the court correctly concluded that he reasonably apprehended danger if he testified.

Section 148 makes it a misdemeanor to "willfully resist[], delay[], or obstruct[] any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ." Section 148.5 makes it a misdemeanor to "report[] to any peace officer . . . that a felony or misdemeanor has been committed, knowing the report to be false . . . ." These statutes, and the cases construing them, can cause a person reasonably to apprehend danger from testifying that he had lied to the police about the identity of a killer's accomplice. It may well be, as defendant argues, that merely denying knowledge of a crime would not violate these statutes. But Jonathan did not merely deny knowledge of the crime; he lied about the identity of one of the culprits and caused an innocent person to be arrested. One case said that a "common sense reading" of section 148.5 "suggests that the section is intended to deter false reports of crimes and the resulting inconvenience and danger to other members of the public . . . ." (*Pena v. Municipal Court* (1979) 96 Cal.App.3d 77, 82 [157 Cal.Rptr. 584].) The false report here inconvenienced Danny Ellis and, by delaying focus on the real cohort, arguably increased the danger to the public.

Defendant argues that mere speech does not violate these statutes. He cites a case stating that section 148 "nearly always has been applied to a wide range of conduct beyond speech." (*In re Andre P.* (1991) 226 Cal.App.3d 1164, 1175 [277 Cal.Rptr. 363].) But this observation does not mean that mere speech can *never* violate this section. Jonathan obstructed the investigation by causing the police to focus on, and even arrest, the wrong person. Some of the cases strongly suggest that such verbal conduct might be criminal. "But section 148 'is not limited to nonverbal conduct involving flight or forcible interference with an officer's activities. No decision has interpreted the statute to apply only to physical acts, and the statutory language does not suggest such a limitation.' " (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329–1330 [116 Cal.Rptr.2d 21], quoting *People v. Quiroga* (1993) 16 Cal.App.4th 961, 968 [20 Cal.Rptr.2d 446].) Moreover, section 148.5 seeks to avoid "waste of law enforcement time and money, [and] defamation of innocent reputations . . . ." (*People v. Lawson* (1979) 100

Cal.App.3d 60, 67 [161 Cal.Rptr. 7].) Accordingly, "there is no rational reason to exclude such false reports [which falsely implicate another person in a crime] from the purview of the statute or to believe that the Legislature intended to do so." (*Ibid.*)

Under these circumstances, it does not clearly appear that the testimony could not possibly tend to incriminate Jonathan. (Evid. Code, § 404.) The Court of Appeal's after-the-fact disagreement with the parties, even if ultimately correct as a matter of law (which we need not decide), does not mean Jonathan did not reasonably apprehend danger at trial. Accordingly, the court acted correctly in permitting Jonathan to assert the privilege under the circumstances.

### C. *Habeas corpus petition*

After we granted review, defendant filed in this court a petition for writ of habeas corpus challenging the judgment. (*In re Larry Seijas*, petn. filed Nov. 23, 2004, S129423.) The petition does not directly relate to the issues on review, and no reason appears for this court to consider it in the first instance. Accordingly, we will transfer the petition to the Court of Appeal so that it may consider it together with any issues remaining on appeal.

"[B]oth trial and appellate courts have jurisdiction over habeas corpus petitions, but a reviewing court has discretion to deny without prejudice a habeas corpus petition that was not filed first in a proper lower court." (*In re Steele* (2004) 32 Cal.4th 682, 692 [10 Cal.Rptr.3d 536, 85 P.3d 444]; see also *People v. Superior Court (Jimenez)* (2002) 28 Cal.4th 798, 806, fn. 3 [123 Cal.Rptr.2d 31, 50 P.3d 743]; *In re Ramirez* (2001) 89 Cal.App.4th 1312, 1320 [108 Cal.Rptr.2d 229]; 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Writs, § 20, pp. 540–541.) Because defendant filed the petition in this court after we had accepted review, and thus while the case was in this court, he acted reasonably in filing it here to begin with. Under these circumstances, we have chosen not to deny the petition without prejudice but instead simply to transfer it to the Court of Appeal. Similarly, this court has held that one superior court may transfer to another superior court a habeas corpus petition that is more properly heard by the second court, even though all superior courts have jurisdiction over habeas corpus. (*Griggs v. Superior Court* (1976) 16 Cal.3d 341, 346–347 [128 Cal.Rptr. 223, 546 P.2d 727] ["Our conclusion that a territorial limitation on the exercise of habeas corpus jurisdiction no longer exists does not mean that this court cannot provide rules of judicial procedure to be followed by superior courts in the exercise of that unlimited jurisdiction."].)

### III. CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with our opinion, including resolving any remaining appellate issues and considering the related petition for writ of habeas corpus.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Moreno, J., concurred.