Filed 7/29/15  P. v. Ayon CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064994 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236859 ) |
| ENRIQUE AYON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Enrique Ayon of two counts of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a); counts 1 & 3); three counts of shooting at an occupied vehicle (§ 246; counts 2, 4, & 6); hit and run (Veh. Code, § 20002, subd. (a); count 8); and vandalism (§ 594, subd. (a)(b)(2)(A); count 9).

As to counts 1 and 2, the jury found that Ayon intentionally discharged a handgun causing great bodily injury, within the meaning of section 12022.53, subdivision (d) and personally inflicted great bodily injury on the victim, within the meaning of section 12022.7, subdivision (a). In addition, in regard to counts 1 and 3, the jury found that Ayon acted willfully, deliberately and with premeditation, within the meaning of section 189; personally used a handgun, within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b); and intentionally discharged a handgun, within the meaning of section 12022.53, subdivision (c). As to both attempted murder counts and all three counts of shooting at an occupied vehicle, the jury found that Ayon personally used a handgun within the meaning of section 1192.7, subdivision (c)(23).

Ayon was separately charged in case No. SCD242840, with three counts of battery on a custodial officer in violation of section 243.1 and three counts of resisting an executive officer in violation of section 69. Ayon pled guilty to all charges.

The trial court sentenced Ayon to prison for two terms of life with possibility of parole, plus 25 years to life, plus 29 years in state prison.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

Ayon appeals, contending: (1) the trial court erred when it did not allow him to present evidence of third party culpability; (2) he was deprived of his due process rights when the trial court excluded a portion of Ayon's recorded jail call; (3) the trial court erred in admitting Ayon's statements made after his arrest; and (4) cumulative error warrants reversal. We conclude there is no merit to any of these contentions and affirm.

FACTUAL BACKGROUND

Prosecution

Ayon purchased a Ruger nine-millimeter semiautomatic handgun. Almost a month later, a Los Angeles County deputy sheriff stopped Ayon's white Chevy Malibu. The car, occupied by only Ayon, had two loaded nine-millimeter magazines in the glove box, and a nine-millimeter handgun in the trunk. Ayon acknowledged ownership of the gun. The deputy confiscated the gun and magazines, but eventually returned them to Ayon.

On October 2, 2011, video captured Ayon in San Ysidro. The next day, employees of the Sunset parking lot in San Ysidro generated an inventory log of cars in their lot, including Ayon's white Chevy Malibu. The next morning, October 4, 2011, Ayon departed the parking lot. Rather than paying, Ayon smashed through the parking gate arm with his car.

Ayon drove onto the freeway and began shooting at people. First, Ayon shot at Demetrous Miller, striking his car and leg. Before being shot, Miller observed a white sedan passing him on the 805 north. As the car passed, Miller heard a "bang" and

3

observed that a bullet had passed through the car door and into his leg. After a trauma surgeon removed the nine-millimeter bullet, police collected it.

Soon after shooting at Miller, Ayon turned his gun on Marcus Eagles. Eagles, also driving on the 805 freeway, observed a white Chevy Malibu coming up from behind. He looked over and saw Ayon pointing a black semiautomatic handgun at him. Ayon shot, and his nine-millimeter bullet went through Eagles's rear door and lodged in a piece of luggage. Eagles pulled over, and Ayon sped off. Law enforcement collected the bullet from Eagles's luggage.

About 10 minutes later, Ayon targeted his next victim on the 5 north. Medic Michael Hartman heard a loud "popping" noise near his ambulance and thought something might be loose in the rear patient area of the vehicle. Shortly thereafter, after exiting the ambulance, Hartman observed two bullet holes on the driver's side. He also saw a nine-millimeter bullet sitting on a gurney inside the ambulance. Law enforcement collected that bullet as well as a second nine-millimeter bullet lodged in the side of the ambulance.

Ayon fled to Los Angeles. As freeway signs had been activated, asking drivers to look out for Ayon, he was soon spotted. Soon thereafter, California Highway Patrol officers, with guns drawn, arrested Ayon as he stood outside of his white Chevy Malibu. Ayon's nine-millimeter handgun was not in the car. However, gunshot residue was found in the interior of the car as well as a spent nine-millimeter shell casing.

4

Lead investigator, Highway Patrol Officer Ken Jackman, contacted Ayon after his arrest. After Jackman was read his *Miranda* rights, Ayon told Jackman, "they were after me," and "I was trying to protect my family." Jackman did not ask Ayon any questions about these statements. Jackman collected gunshot residue samples from Ayon's hands. The samples tested positive for particles of gunshot residue that indicated Ayon may have fired a gun. A long sleeve shirt found in the truck of Ayon's car appeared to be the same shirt he had been captured wearing earlier in a Sunset parking lot surveillance tape. That shirt also tested positive for gunshot residue particles.

Police searched Ayon's home. In a closet, they discovered 50 nine-millimeter rounds and an empty box for a nine-millimeter Ruger handgun and a corresponding receipt in Ayon's name. The gun box included a "test round." Before a gun is sold, its manufacturer will test fire the gun. This "test round," which is "the test fired round, the brass casing of [the] bullet," is then placed in the box and sold with the gun. This test round, the four spent bullets recovered from Ayon's victim, the victims' vehicles, and the spent shell casing found in Ayon's car were provided to firearm's expert Anthony Paul.

As to the four nine-millimeter spent rounds recovered from Ayon's victims' car, and one victim, Paul testified that they were all fired from the same nine-millimeter gun. As to the test round shell casing found in Ayon's empty gun box inside his closet, Paul testified that it had been fired from the same gun that fired the spent shell casing that was found inside Ayon's car when he was arrested.

5

Defense

Ayon called a memory and suggestibility expert who testified that eye witnesses can be wrong. Ayon also called a San Diego crime lab analyst who testified that all four of the bullets recovered were shot from the same gun. That analyst reported that the bullets could have been fired from a nine-millimeter, .57, or .38 caliber handgun.

DISCUSSION

I

*THIRD PARTY CUPLABILITY EVIDENCE*

Ayon contends the trial court abused its discretion and violated his rights to present a defense and due process by excluding third party culpability evidence. He argues the court should have allowed him to present testimony from an eyewitness (Reynaldo Salgado) of the subject freeway shootings. To this end, Ayon maintains: (1) the trial court erred in allowing Salgado to invoke his Fifth Amendment right not to testify; (2) the trial court should have granted Salgado judicial immunity to allow him to testify; and (3) because Salgado did not testify, his out-of-court statements should have been admitted as declarations against interest. As Ayon's arguments all rest on the foundation that Salgado could offer third party culpability evidence, our conclusion that Salgado would provide no such evidence undermines Ayon's contentions.

A. Background

Prior to trial, the prosecutor filed a motion to exclude evidence he believed the defense would attempt to use as third party culpability evidence. Specifically, the motion

6

informed the trial court that through intercepted phone calls, unrelated to the instant case, police had learned that a man named Mayo told a man named Juan that a man named Chito (later identified as Reynaldo Salgado) told Mayo that he had been with the men who perpetrated the freeway shooting. According to Mayo, Salgado told him that he had not been in the car with the shooter, but had been in a car behind the shooting car. The prosecution's motion further detailed that another phone call was intercepted between Juan and Salgado. In that call, Juan asked Salgado if he had been involved with a shooting. Salgado responded, "Oh, no well just there with another dude but I didn't . . . I didn't have anything to do with it." Later, when Salgado was contacted by a defense investigator, Salgado told the investigator that he did not know who was involved in the freeway shootings.

The prosecution's motion to exclude Salgado's statement cautioned that the prosecution was "unclear precisely" how the defense intended to use the statements of Salgado, and thus asked the court to exclude Salgado's statements as irrelevant and speculative because nothing Salgado said linked him to the shooting. The prosecution argued that Salgado's out-of-court statements could not properly come in as third party culpability evidence because to constitute same, Salgado's statement would need to link a "third person to the actual perpetration of the crime," which it did not. The prosecutor further argued if Salgado's statements were admitted, the prosecution intended to impeach Salgado by introducing cell tower records, which showed that Salgado was nowhere near the shootings when they took place. The prosecutor asserted that this would require a "second trial" within Ayon's trial.

7

In the phone call between Juan and Mayo, Mayo stated that he asked Salgado if he had been involved in the freeway shootings and Salgado told him, "oh, no problem dude. I was with those dudes[,]" and purportedly explained to Mayo that "he was with some . . . some friends and that uh . . . that he wasn't with the . . . in the car that fired. That he was with another car behind that car and that the car that was in front was a white car and yes, that . . . that was a white car. An Impala was the one that . . . the one that did all that shit and he says that . . . that . . . he says that . . . I don't know, that he just started . . . took out . . . took out the weapons through the window and started to fire like that. No? But he says that he only went with them but that he didn't know shit . . . and that when he looked because that that dude well just started firing and well they only fired a fucking police car and they injured some people from the their feet and they riddled an ambulance and no . . . they made a mess."

In a later phone call between Juan and Salgado, consistent with his alleged statement to Mayo, Salgado claimed to have been with "another dude" during the shooting, but "didn't have anything to do with [the shooting]." In a second phone call between Juan and Mayo, Mayo repeated that Salgado had told him that he was in a second car behind the white car that perpetrated the shootings. Mayo told Juan that he suspected Salgado may have fabricated being there at all. In a later interview with a defense investigator, Salgado stated that "he heard about the [shootings] on the news." Salgado said that he did not know who was involved in the freeway shootings. He also stated that he was familiar with Ayon, whom he understood to be "involved with drugs."

8

At the hearing on the prosecution's motion, the prosecutor noted that the transcripts of the various calls, filed in support of the motion to exclude, were redacted. The trial court conducted an in camera hearing and the transcript was ordered sealed. The court noted that if the defense wished to bring Salgado to court to testify, the court would then hold a hearing for purposes of determining if Salgado would be asserting his Fifth Amendment privilege. Apparently, the court was concerned after viewing the evidence in camera that whatever information Salgado possessed had something to do with an FBI investigation and an impending large narcotics transaction.

Following the prosecution's case-in-chief, Ayon's trial counsel brought Salgado into court, along with Salgado's court-appointed counsel. Salgado asserted his Fifth Amendment privilege and refused to testify. Discussing the privilege, the prosecutor noted that Salgado's prior out-of-court statement involved a conspiracy to sell narcotics that could subject him to prosecution. He also noted that if Salgado made any statement attempting to link him to the freeway shooting, Salgado might subject himself to prosecution for that involvement. The trial court accepted Salgado's invocation of his Fifth Amendment privilege as valid based on the court's conclusion that in the recorded conversation, Salgado was "obvious[ly]" discussing his effort "to set up a large narcotics transaction" that would cause him to run afoul of state and federal law.

Further, even assuming Salgado was willing to testify, discussing the substance of the proposed testimony itself, the trial court noted that in the recorded call, Salgado claimed that "he knew nothing about" the shooting. Moreover, the court was skeptical that Salgado had any knowledge of the shootings:

9

"From my review of these calls and all the circumstances and what I know now after having heard the extensive testimony regarding these shootings, I believe it's highly unlikely that Mr. Salgado was anywhere near those shootings when they actually occurred. [¶] It does appear to me that he was just puffing in order to try to increase the likelihood that he would be able to complete these drug transactions."

Without ruling on the fact that Salgado, in his purported out-of-court statements, had never claimed to identify the freeway shooter—Ayon or some other culpable third party—the court accepted Salgado's invocation of his Fifth Amendment privilege.

Ayon's trial attorney thus argued that because Salgado was rendered unavailable by his invocation of the Fifth Amendment, his out-of-court statements should be admitted at trial as declarations against interest. The trial court disagreed. It found that Salgado's statements were not against his penal interest because all that Salgado said was that he was in a car "behind" the vehicle committing the shooting and "had nothing to do with it." The court found Salgado's out-of-court statements to be "rank hearsay without an exception" to admit them.

## B. Standard of Review and the Law

"The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence. . . . Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.) Put differently, "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

10

Under the federal and California Constitutions, a criminal defendant has the right to present witnesses and other evidence in his or her defense. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302; *People v. Hansel* (1992) 1 Cal.4th 1211, 1219.) Pursuant to that constitutional right, a defendant may present evidence of third party culpability (i.e., that another person committed the charged offense). (*People v. Basuta* (2001) 94 Cal.App.4th 370, 386.)

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) " '[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*People v. Avila* (2006) 38 Cal.4th 491, 578, quoting *Hall*, *supra*, 41 Cal.3d at p. 833.)

"[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall*, *supra*, 41 Cal.3d at p. 834.) Furthermore, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the

11

admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*Ibid.*)

Although a defendant is constitutionally entitled to present "a complete defense" (*California v. Trombetta* (1984) 467 U.S. 479, 485), that right does not encompass the ability to present evidence unfettered by evidentiary rules (*People v. Brown* (2003) 31 Cal.4th 518, 538). "[T]he Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' " (*Holmes v. South Carolina* (2006) 547 U.S. 319, 320 [stating evidentiary rules that preclude the admission of third party culpability evidence insufficiently connecting the third person to the crime are "widely accepted"].) When a trial court exercises its discretion to exclude evidence and does not abuse that discretion, the exclusion of the evidence (including proffered third-party culpability evidence), does not impermissibly infringe on a defendant's federal constitutional rights. (*People v. Prince* (2007) 40 Cal.4th 1179, 1243.)

## C. Analysis

Ayon maintains that the excluded evidence would have supported his theory that "the shooting was actually committed by a group of gang bangers out on a crime spree, with at least two members in a white car being involved in the shooting." Ayon, however, provides no citation to the record to support his position. Indeed, our review of the proffered evidence did not uncover any substantiation for Ayon's gang crime spree theory. This theory is nothing more than speculative conjecture and does not raise a reasonable doubt as to Ayon's guilt.

At best, Salgado's testimony would establish that he was riding in a car behind a white car from which the shots were fired. In this sense, Salgado's testimony could be relevant, but only to corroborate the prosecution's version of events: the shooter was in a white car. This evidence does not establish the identity of the shooter or provide any basis for the jury to question the strong evidence offered by the prosecution (including an eyewitness identification of Ayon). Indeed, the connection between Salgado and the shooter is remote. "Evidence that another person . . . had some 'remote' connection to the victim or crime scene[ ] is not sufficient to raise the requisite reasonable doubt. [Citation.] Under *Hall* and its progeny, third party culpability evidence is relevant and admissible only if it succeeds in 'linking the third person to the actual perpetration of the crime.' " (*People v. DePriest* (2007) 42 Cal.4th 1, 43.)

Although we deem the evidence marginally relevant in that Salgado stated the shooter was in a white car, the trial court would have been well within its discretion to exclude the evidence under Evidence Code section 352. Its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion. (Evid. Code, § 352.) In fact, in arguing the admissibility of the evidence, the prosecutor's and defense counsel's arguments make clear that a mini-trial would have occurred regarding Salgado's testimony. The trial court therefore could have reasonably excluded the testimony.

Here, however, the trial court made no such ruling, but allowed Salgado to invoke his Fifth Amendment right not to testify and then refused to grant him judicial immunity. Finally, the trial court did not admit Salgado's out-of-court statements as declarations

13

against interest. Ayon's contentions as to each of these issues lose any of their persuasiveness (to the extent any existed) after we conclude the evidence was not exculpatory. Nevertheless, we will briefly address each of these arguments.

1. *Salgado's Right to Invoke the Fifth Amendment*

The principle that a witness may not be compelled to incriminate himself is a "bedrock principle" of American law embedded in the federal and state Constitutions. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 (*Seijas*).) A witness may properly assert the privilege who has " 'reasonable cause to apprehend danger from a direct answer.' " (*Ibid*.) The privilege is liberally interpreted. A witness may not avoid testifying simply by stating that to do so would be incriminating. However, " '[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' [Citation.]" (*Ibid*.) The assertion of the privilege must be allowed unless after a careful consideration of all the circumstances the answers sought "cannot possibly" have a tendency to incriminate. (*Id*. at pp. 304-305; see also Evid. Code, § 404.)

In deciding whether the privilege is properly invoked, a court is not permitted to consider the likelihood of an actual prosecution in which the witness's statements would be offered. The sole question is whether the answers sought might tend to incriminate the witness. (*Seijas*, *supra*, 36 Cal.4th at p. 305.) It is not even necessary that the answers sought would incriminate the witness. It is enough that the witness "had reasonable cause to apprehend danger from the testimony." (*Id*. at p. 306.) A court may not be skeptical

14

about a witness's apprehension that the testimony sought would be incriminating. The court "must . . . be acutely aware that in the deviousness of crime and its detection incrimination may be approached and achieved by obscure and unlikely lines of inquiry." (*Prudhomme v. Superior Court* (1970) 2 Cal.3d 320, 326-327, fn. 9.) In addition, a witness may be able to assert a valid Fifth Amendment privilege with respect to a criminal offense at issue in a trial, notwithstanding that the witness is not a defendant in the case in which he is invoking the privilege. (*People v. Cudjo* (1993) 6 Cal.4th 585, 617; *People v. Mincey* (1992) 2 Cal.4th 408, 442.)

Also, we are mindful that once a witness testifies, the privilege against self-incrimination is waived with regard to relevant cross-examination. Any other rule would result in a distortion of the judicial process. Thus, while direct examination might be tailored to avoid self-incrimination, reasonable cross-examination might not be so benign. (See *Mitchell v. United States* (1999) 526 U.S. 314, 321-322.)

In reviewing a trial court's ruling on a witness's assertion of the privilege against self-incrimination, we view its factual determinations deferentially but independently review the ultimate issue of whether the privilege was properly invoked. (*Seijas*, *supra*, 36 Cal.4th at p. 304.)

Salgado had reasonable cause to "apprehend danger" from testifying at trial. The trial court noted that Salgado's out-of-court statement, beyond his claim of being in the car behind the shooting vehicle, "obvious[ly]" involved his effort "to set up a large narcotics transaction" that would violate state and federal criminal law. Salgado thus

15

could invoke his Fifth Amendment right to avoid testifying. (See *Seijas*, *supra*, 36 Cal.4th at pp. 305-306.)

However, Ayon argues Salgado's testimony about the shooting could have been kept separate from any questioning about a potential narcotics transaction. Yet, the prosecution would have been well within its rights to cross-examine Salgado about the narcotics transaction to impeach him. (See *People v. Abner* (1962) 209 Cal.App.2d 484, 489; *Chambers v. Mississippi*, *supra*, 410 U.S. at p. 295.)

Accordingly, we are not satisfied that if Salgado testified at trial, the answers sought could not " '*possibly*' " have a tendency to incriminate him. (*Seijas*, *supra*, 36 Cal.4th at pp. 304-305; see Evid. Code, § 404.) The court therefore properly found Salgado had a right to assert his Fifth Amendment privilege.

### 2. *The Trial Court's Failure to Provide Judicial Immunity*

Ayon maintains that even if Salgado could properly invoke the Fifth Amendment, the trial court erred in failing to provide him with judicial immunity. We disagree.

"It is settled in California that the granting of transactional immunity is conditioned upon a written request by the prosecutor that the witness be compelled to answer." (*People v. Hunter* (1989) 49 Cal.3d 957, 973 (*Hunter*), citing § 1324 and *In re Weber* (1974) 11 Cal.3d 703, 720.) Ayon contends that the defendant in a criminal action should be entitled to have the court grant use immunity to a defense witness who has knowledge of essential, exculpatory evidence.

As a threshold matter, Ayon fails to provide any California case authorizing a trial court to provide a defense witness with immunity. At best, he cites to a number of cases

mentioning that no appellate court in California has held that trial courts lack authority to grant judicially declared immunity. (See *Hunter*, *supra*, 49 Cal.3d at p. 973; *People v. Stewart* (2004) 33 Cal.4th 425, 469 (*Stewart*); *People v. Samuels* (2005) 36 Cal.4th 96, 127.) However, "[a]n appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620, 71.) Therefore, none of the California cases cited by Ayon are instructive here.

Further, even if we were to adopt one of the tests for the granting of judicial immunity outlined in *Hunter*, *supra*, 49 Cal.3d 957, and discussed in *Stewart*, *supra*, 33 Cal.4th 425, we would not find that the trial court erred in the instant matter. Our high court noted that a potential test for the granting of judicial immunity would require: "(1) ' "the proffered testimony [is] clearly exculpatory; [(2)] the testimony [is] essential; and [(3)] there [is] no strong governmental interest[] which countervails[] against a grant of immunity." ' " (*Stewart*, *supra*, 33 Cal.4th at p. 469.) As we discuss above, Salgado's testimony is not clearly exculpatory. Further, the testimony is not essential. As such, even assuming *Stewart* and *Hunter* stand for the proposition that a trial court could grant immunity under certain, limited circumstances, the facts here do not support any such grant.[2]

---

[2] Ayon also cites a number of Ninth Circuit cases for the proposition that a witness's refusal to testify coupled with prosecutorial misconduct could warrant the granting of immunity for a defense witness to protect and enforce the defendant's due process right to a fair trial. These cases are no help to Ayon. There is no indication in the record that the prosecutor committed misconduct. Also, to the extent Ayon relies on *Government of*

### 3. *The Trial Court's Failure to Admit Salgado's Out-of-Court Statements as Declarations Against Interest*

Finally, Ayon insists that if we determine that Salgado properly exercised his Fifth Amendment right and the trial court did not error in refusing to grant judicial immunity, the trial court nonetheless erred in failing to admit Salgado's out-of-court statements as declarations against interest under Evidence Code section 1230. We are not persuaded.

Again, Salgado told another person that he "didn't have anything to do with [the shooting]." He told a defense investigator that he had no involvement with the shooting and knew nothing about it. A declaration against interest under Evidence Code section 1230 requires that the declarant's statement be shown to be "so far contrary" to the declarant's interest that it subjects him or herself to the risk of criminal prosecution. (Evid. Code, § 1230.) Nothing about Salgado's statement suggested any involvement in the shooting. Accordingly, we are satisfied that the trial court's decision to exclude the evidence was not "arbitrary, capricious, or patently absurd" and did not result "in a manifest miscarriage of justice."[3] (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1113.)

---

*Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964, to establish federal authority for a judicial grant of immunity, we note that this case was recently overruled. (See *United States v. Quinn* (2013) 728 F.3d 243, 247.)

[3]    To the extent Ayon is arguing that Salgado's statements made to Juan as Juan relayed them to Mayo should have been admitted, Ayon offers no arguments or authority that would allow this double hearsay to be admitted.

18

## II

*JAIL TELEPHONE CALLS*

Ayon next asserts he was deprived of his due process rights when the trial court excluded the portion of his recorded jail call in which he denied wrongdoing. We disagree.

### A. Background

The prosecution possessed recordings of two of Ayon's phone calls from jail. Both calls included inculpatory statements made to a small child. In the first call, Ayon said, "dada did something bad, baby, so the cops have him, baby" and "dada's a bad boy." This statement occurred when Ayon was talking with a young child who he referred to as his daughter. An adult woman was on the phone as well. After the child got off the phone, Ayon continued to talk to the woman. The woman indicated that she had bought Ayon a "mystery thriller" book. They then argued about whether Ayon would accept the book, and Ayon told the woman he wanted a book about "ghosts and demons . . . ." After discussing the book, the woman asked Ayon if he had talked to his lawyer. In answering the question, Ayon claimed, "they know I didn't do that shit."

In the second call, Ayon said, "dada's a bad boy." The second call, made over a month after the first, included no exculpatory statements.

The prosecutor asked the trial court to allow these inculpatory statements. When the trial court granted the prosecution's motion to allow the inculpatory statements, Ayon's trial counsel requested, under Evidence Code section 356, introduction of the exculpatory portion of the first jail phone call when he said "they know I didn't do that

19

shit."  The trial court commented that the first jail call involved two separate conversations, one with the child and one with the child's mother, and to trigger Evidence Code section 356, the exculpatory statement had to arise in the same "conversation" as the inculpatory portion, which it had not.  The court thus allowed the prosecution to present the inculpatory statements, but did not allow the defense to offer the exculpatory statement.

### B.  Law and Analysis

Evidence Code section 356, "sometimes referred to as the statutory version of the common law rule of completeness" (*People v. Parrish* (2007) 152 Cal.App.4th 263, fn. 3), provides as follows:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  (Evid. Code, § 356.)

The purpose of Evidence Code section 356 is to "prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed."  (*People v. Arias* (1996) 13 Cal.4th 92, 156.)  Additionally, when a statement admitted into evidence constitutes a part of conversation, the jury is entitled to know the context of those statements made.  (*People v. Harris* (2005) 37 Cal.4th 310, 334.)

20

We review a trial court's determination of whether evidence is admissible under Evidence Code section 356 for abuse of discretion. (*People v. Parrish*, *supra*, 152 Cal.App.4th at p. 274.)

Here, Ayon maintains the first telephone call should be considered consisting of only one conversation. He argues that because the adult woman was on the phone the entire time, only one conversation occurred. As such, under Evidence Code section 356, the exculpatory statement should have been admitted.

The trial court treated Ayon's first recorded telephone call from jail as two separate conversations. The first concerned Ayon's conversation with his daughter. During that conversation, the adult woman was on the line, but she merely helped to facilitate the conversation between Ayon and his young daughter. The conversation centered on Ayon checking on his daughter's well-being, explaining where he was, and telling his daughter that he loved her. There was no discussion of his lawyer, books that he wanted to read, or what punishment he might be facing. When his young daughter got off the call, Ayon moved on to more serious topics with the adult woman. The conversation between Ayon and the adult woman did not give context or meaning to Ayon's conversation with his daughter. The two conversations thus were unrelated. The trial court's ruling that the exculpatory statement could not be admitted into evidence did not prejudicially distort the conversation between Ayon and his daughter or present a misleading or distorted version of the relevant events. The court's decision to exclude the exculpatory comment made by Ayon to the adult woman was neither irrational nor arbitrary. (See *People v. Carmony* (2004) 33 Cal.4th 367, 377 ["[A] trial court does not

abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."].)  There was no error.

III

*AYON'S POSTARREST STATEMENTS*

After Ayon was apprehended, Officer Jackman contacted Ayon.  When Jackman informed Ayon that he was under arrest, Ayon, "blurted out, for lack of a better term, two separate statements that were unsolicited [by Jackman.]"  First, Ayon declared, "they were after me."  Then Ayon offered, "I was trying to protect my family."

Ayon's trial attorney asked the trial court to preclude the prosecutor from introducing both of Ayon's statements into evidence.  The trial court conducted an Evidence Code section 402 hearing for purposes of hearing the testimony of Officer Jackman.[4]  Jackman testified that on the day of Ayon's arrest, Ayon made the two subject unsolicited statements.  Jackman, who observed that Ayon appeared to be under the influence of methamphetamine, did not ask Ayon any questions or to otherwise clarify the statements.

Ayon's trial attorney also asked Jackman about his reporting of these statements. Jackman admitted that in his report, dated two days after Ayon's October 4, 2011 arrest, he had not memorialized Ayon's statements.  Jackman testified that he prepared a supplemental report on January 31, 2012, wherein he noted the statements.

---

4       The court conducted an Evidence Code section 402 hearing to ascertain the potential of an *Edwards v. Arizona* (1981) 451 U.S. 477 "situation" and determined that none existed.  This issue is not before us here.

The trial court ruled Ayon's statements admissible as party admissions under Evidence Code section 1220.

Here, Ayon contends his two statements should not have been admitted into evidence. He focuses on the fact that Jackman failed to document the statements for more than four months after the incident. He points out that Jackman never explained the reason for the delay. Ayon's arguments, however, go to the weight of the evidence, not its admissibility. "[U]ncertainties and discrepancies in witnesses' testimony raise only evidentiary issues that are for the jury to resolve." (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1259; see *People v. Boyer* (2006) 38 Cal.4th 412, 480-481; *People v. Allen* (1985) 165 Cal.App.3d 616, 623.) It is not the province of this court to second guess the jury as to a credibility determination.[5] (*People v. McDaniels* (1980) 107 Cal.App.3d 898, 903.) The trial court did not abuse its discretion in admitting Ayon's statements.

IV

*CUMULATIVE ERROR*

Ayon also maintains the cumulative effect of the asserted errors rendered the trial so unfair as to violate his federal and state constitutional rights to due process warranting reversal of the judgment. We have rejected Ayon's claims of error. Because we hold no

---

[5]     Ayon bootstraps an Evidence Code section 352 argument to his claim that Jackson's testimony about Ayon's statements was unreliable. Again, this argument goes to the weight of the evidence and does not explain how the statements' "probative value is substantially outweighed by the probability that [their] admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.)

23

errors exist, this cumulative error argument necessarily fails.  (See *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative effect of errors when no error]; *People v. Butler* (2009) 46 Cal.4th 847, 885 [rejecting cumulative effect claim when court found "no substantial error in any respect"].)

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.