Filed 6/17/22  In re P.K. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.K., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.H.,<br><br>    Defendant and Appellant. | E078512<br><br>(Super.Ct.No. J280733)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Kaleigh Ragon, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated defendant and appellant, C.D. (mother's), parental rights as to P.K. (minor, born Aug. 2009). On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On April 5, 2019, personnel from the San Bernardino County Children and Family Services (the department) received a referral alleging physical abuse by mother and J.K. (father)[2] (collectively, the parents) to H.H. (born Nov. 2005), general neglect by mother to R.Y. (born Feb. 2007) and H.H., emotional abuse by mother to all the children, and emotional abuse by father to minor. Father was alleged to be a chronic opioid user due to a back injury. Father had stated on multiple occasions that he wanted H.H. out of the house, and H.H. was ruining their family. The parents acknowledged that father had been trying to get H.H. arrested for the past one-and-a-half years so that H.H. would be out of the house and the parents would no longer be responsible for him. H.H. said he was locked in his room "fulltime." He said that as part of his punishment, the parents did not send him to school. He reported sleeping on the floor with a jacket and blanket. H.H. said he had no heat in his room. He reported being physically abused but would not provide examples due to fear of being punished.

---

[1] By order dated February 18, 2022, we incorporated the record in *C.H. v. Superior Court*, case No. E076676, from mother's notice of intent to file a petition for extraordinary writ, in the record in this case. The case was dismissed March 25, 2021.

[2] Father was the biological father of minor only. Father is not a party to the appeal. Father committed suicide in May 2020.

On April 9, 2019, department personnel received another referral reporting that H.H. and R.Y. were being locked in their rooms; even the windows were locked so that they could not get out. The reporting party said that H.H. stole parent's credit card; father then "choked him out." The reporting party said the parents were "hurting [H.H.] and leaving marks on him and will not send him to school because they do not want the school to see the marks." The reporting party said father "choked out" mother, possibly in front of the children.

Department personnel had previously opened a voluntary maintenance case on May 21, 2014, with the parents and the children. On January 12, 2015, the court detained H.H., R.Y., and minor from parents for general neglect. The case was closed on September 30, 2016. A court had previously terminated the parental rights of N.P., the biological father of H.H. and R.Y., as to three of their half siblings on May 13, 2013, and a fourth half sibling on May 5, 2014.[3]

On April 18, 2019, the social worker interviewed H.H. at school. H.H. said he did not want to get mother in trouble: "'It's my dad. My dad said if I tell I would be a ward of the state.'" H.H. said he was now locked in his room all day and had only a blanket for a bed. He said "'my dad hits me and chokes me out and one time I even lost consciousness.'" H.H. reported that "'most of the time when my dad hits me or chokes me, it is behind the door and away from the camera.'"[4] "[O]n the rare occasion when his

---

[3] N.P.'s whereabouts were unknown, and he never participated in the case.

[4] The parents kept a camera facing H.H.'s bedroom door.

3

mother ha[d] observed [father] hitting or choking him she would jump on [father] and try to stop him." The last time father choked H.H. out was approximately two months earlier.

H.H. reported that father hits him with father's fist, sometimes with one knuckle out, which would leave a lump on H.H.'s head. H.H. demonstrated how father would choke him by placing one arm around the front of his neck as in a headlock. H.H. said father also choked mother out four or five times. He said father also hit R.Y., but father never hit minor. H.H. was afraid of what would happen if parents found out he had spoken with the social worker.

On April 18, 2019, the social worker went to the parent's home. Mother said she would let H.H. out of his room "'sometimes.'" She said she kept H.H. locked in his room because he had stolen her credit card information and the department did not help her with his behavioral problems. The social worker said the school, the department, the Department of Behavioral Health, and medical doctors had offered the family multiple services. The children received services at school; parents refused in-home services and had not participated in any services themselves. Mother declined medication for the children because she believed it was poison.

Mother denied father would hit H.H. She said H.H. lies. H.H. was found in a dark, locked room with a camera facing the door. His room had dirty, stained carpeting and a single blanket. The windows appeared to be locked from the outside. R.Y.'s room had a mat with blankets and a pillow on a concrete floor. There were no working lights in either room.

4

Minor's room "appeared considerably different as it consisted of carpeting, a box spring and mattress with blankets and pillow," furniture, and a light. Minor said R.Y. and H.H. would lie about parents. He reported that he had missed a lot of school.

Father had a criminal history which included corporal injury to a spouse, kidnapping, grand theft, criminal threats, and burglary. The paternal grandparents arrived at the home and expressed their desire for the placement of minor with them. Department personnel took the children into protective custody.

On April 22, 2019, department personnel filed a section 300 juvenile dependency petition alleging, as to mother and minor, that mother knew or reasonably should have known that father was physically abusing H.H. and R.Y., placing minor at similar risk of abuse (a-1); that mother knew or reasonably should have known that father was physically abusing H.H. and R.Y., placing minor at similar risk of abuse (b-2); that mother failed to provide for H.H. and R.Y., placing minor at risk of similar neglect (b-3); that mother failed to provide for the children's educational needs (b-4); that mother knew or reasonably should have known that father was physically abusing H.H. and R.Y., placing minor at similar risk of abuse (b-5);[5] mother knew or reasonably should have known that father was abusing substances, placing the children at risk of harm (b-6); that father abused substances placing minor at risk (b-7); and that a voluntary maintenance case had previously been opened and closed, yet the children remained at risk of the same issues (j-8). On April 23, 2019, the juvenile court detained the children.

---

[5] The b-5 allegation is identical to the b-2 allegation.

In the May 15, 2019, jurisdiction and disposition report, the social worker reported she had called the parents on four occasions but was unable to leave a voicemail. On April 30, 2019, the social worker spoke with H.H. who said mother knew father "'choked me out.'" He said father also choked out R.Y. twice and mother "too." H.H. said he was not taking his medication because the parents did not feel like making appointments to take him to the doctor. Father reported he had a back injury for which he took opiates. The social worker noted that 51 referrals had been made on the household since June 2010. On June 24, 2019, department personnel amended the petition to add allegations that mother and father had engaged in domestic violence in front of the children.

In a first addendum report filed June 25, 2019, the social worker recommended the court deny the parents reunification services pursuant to section 361.5, subdivision (b)(6) (severe physical harm to the child or a sibling). The parents declined to be interviewed without counsel present. The maternal aunt reported that father had held a gun to H.H.'s head when H.H. was three years old. She reported that father had also previously held a gun to mother's head and made her get in the car and leave. An officer had arrested father and he spent time in jail. Father reportedly attempted to commit suicide by hanging himself in the closet. An officer confirmed being called to the home when father had tried to hang himself. Records from prior cases reflected that both R.Y. and H.H. had been prescribed psychotropic drugs. H.H. refused to visit either mother or father.

In an evidentiary interview conducted by two social workers and an officer, H.H. reported being locked in his room for prolonged periods of time. All he had was a blanket. He slept on the ground and was cold all the time except in summer. He said he

6

was often thirsty as he was only allotted half a cup of water a day. He said he once went five days without eating. He was only allowed to sponge bathe outside; sometimes when father was gone, mother would allow him to shower. He once went three weeks without a sponge bath or shower.

H.H. described his life as "'miserable.'" Father told him multiple times father would kill him. Father choked him to unconsciousness on multiple occasions. Father hit him multiple times in the head leaving bumps. On one occasion, he heard father choking R.Y. H.H. said mother told him father had choked mother. In another interview he reported he was 11 when father attempted suicide by hanging himself with a necktie. H.H. said he repeatedly tried to hang himself like father.

In a July 10, 2019, additional information to the court report, the social worker reported that visits between the parents and the children had not occurred until June because mother failed to return phone calls. Visits had been consistent since. Mother refused to visit H.H. and asked that he not be allowed visitation with his siblings. The court ordered visitation between the children and visits between the children and the parents to occur once weekly for two hours; they were to be "closely monitored."

In a September 16, 2019, additional information to the court report, the social worker noted that visits had occurred between the parents and the children. In a November 4, 2019, addendum report, the social worker noted she had obtained the children's school records and there were significant unexcused absences. Mother visited with minor on July 1, 2019. On August 25, 2019, the parents and the paternal grandparents visited with minor for a supervised birthday party. The social worker noted

7

that "mother has been engaged in setting up visits. She sets limits well, has a positive disposition with her younger children." The social worker recommended the court order no additional visits until mother benefitted from services.

In a November 18, 2019, third addendum, the social worker reported that minor said he was in foster care due to H.H.: "'My mom said he's the reason we got put in a group home, so I don't like him anymore' and that [H.H.] was 'bad all the time because he will say lies about me and my sister and my mom and dad.'" The paternal grandparents (PGPs) had been taking classes required to become a foster family. They had provided information for background checks. They had no criminal history. The PGPs had yet to be approved, "but there is every indication that their home will be approved."

The PGPs had maintained a bond with minor. "They have consistently demonstrated that they have the best interest of the children in mind." They exercised "proper and effective care and control of" minor. The paternal grandfather "has shown a particularly strong ability to connect with the children on their level when interacting with both [R.Y.] and [minor]. He has shown an interest in [H.H.] and hopes that he will 'get better.'"

The social worker had obtained an arrest report dated April 23, 2009, which reflected that father had been verbally abusing then three-year-old H.H., threatening to smack him for walking away with father's property, which turned out to be a firearm. Mother had said she was "'extremely frightened for her safety and the safety of her [then] two children. On several occasions throughout the night, [father] attacked her, pushing

8

her to the ground and throwing her around the house.'" Officers arrested father. The social worker opined that the children deserved permanency; mother had previously received services for herself and the children, yet issues of domestic violence and the severe physical abuse of H.H. continued.

In a fourth addendum report filed January 14, 2020, the social worker reported that on November 24, 2019, the parents were involved in a domestic violence incident at father's residence for which father was arrested. On December 17, 2019, defendant pled no contest to misdemeanor battery on a cohabitant (Pen. Code, § 243(e)(1)) and was sentenced to 60 days in jail. A court issued a one-year criminal protective order prohibiting father from having contact with mother.

Mother's latest visit with minor had occurred on January 4, 2020. Mother reported all visits went well. Mother told the social worker that "she now sees restraining the children . . . by locking them in their room [is] unsafe and understands why [the social worker] was concerned about possible fires or medical emergencies . . . ." Mother stated she still does not believe father was ever violent with the children. "Mother continues to deny or minimize her choices and parenting practices and continues to blame her behaviors on [the department], medical personnel, and law enforcement." Father reportedly tried to kill himself after his arrest.

Minor was placed with the PGPs "during the Holiday's." "[I]t appears [minor] is thriving in this placement." "Paternal grandparents have been able to demonstrate they can be protective and are a concurrent placement and are willing to adopt [minor] should

9

the parents fail to reunify. [Minor] is aware his parents are no longer living together and although sad, he . . . enjoyed his visits with them."

In a June 15, 2020, additional information to the court report, the social worker reported that father had committed suicide on May 22, 2020. After services for father, "the children were able to spend about [three] hours with their mother in a supervised setting that included lunch." Minor was "doing well in placement with his grandparents and has requested he remain with them." The department recommended that minor "remain with paternal grandparents who wish to adopt him. . . ." In a second amended detention report dated July 21, 2020, the social worker reported that minor had been placed in the PGP's home on January 15, 2020.[6] He was "thriving in this placement."

At a hearing on December 7, 2020, it appeared the parties had come to an agreement pursuant to which mother would not contest jurisdiction; if the court applied the section 361.5, subdivision (b)(6) bypass provision, the department would recommend guardianship, rather than adoption, as the permanent plan. However, mother decided to take the matter to trial and the matter was continued.[7]

---

[6] At some point after June 20, 2020, H.H. was placed under the jurisdiction of the juvenile delinquency court.

[7] The long delay between the detention and jurisdiction hearings was due, in part, to repeated conflicts declared between mother and her counsels, which required continuances to allow newly appointed counsel to prepare for a contested jurisdictional hearing. At one point, counsel for the department objected to the repeated continuances: "I think this is, perhaps, the fifth attorney the mother has had . . . ." Additional continuances were due to COVID-19 protocols.

At the contested jurisdiction hearing on March 1, 2021, mother testified that H.H. had made false allegations that father was choking people in the house. H.H. was a liar. Father never choked mother, nor did she ever say that he had. Father never grabbed her by the hair or dragged her as alleged in one of the police reports. Mother did not believe father had physically abused any of the children.

The parents began locking H.H. in his room at the age of five, at night from 8:00 p.m. until the morning to keep him from molesting R.Y. They had caught H.H. doing "stuff that was really mind-blowing and disturbing." "He was having intercourse with his sister and trying to convince her that they were going to get married and run away together." From the age of four "he was trying to insert his penis into her." Mother also caught him trying to have intercourse with minor. H.H. and R.Y. "were acting out sexually inappropriately and also had aggressive, destructive behaviors." "They were smearing feces on the wall . They were eating their feces. They were destroying property and aggressive towards others."

H.H. slept on a mat with a blanket and pillow in his room with no electricity. H.H. did not have a bed for four months because he broke the frame; but he still had a mattress and box spring. He did not have any bathroom facilities in his room. He had broken all the lightbulbs in his room. The electricity had not been working in his room for at least a couple of months. H.H. was always able to open his windows. He could not open his window. H.H. was allowed to bathe in the house daily.

They also locked R.Y. in her room: "A couple times she had tried running away, and one of the times she had said that she was going to marry her brother, and they were

11

going to live happily ever after. Another time she didn't really have a reason or rhyme. She just took off and went to my neighbor's house, and then from there, took off down the street . . . ." "Because she would sneak out of her room, and we had mountain lions, bears, and bob cats that lived up and surrounded us around our property, and it was extremely dangerous. Besides, I was worried about her getting picked up by a stranger." They would lock her in her room whenever she had an outburst or they had to separate the children.

There was no light, electricity, or lightbulbs in R.Y.'s room in April 2019. There was a mattress in her room. There was no carpeting in her room. There was no heat in either H.H. or R.Y.'s rooms. Minor had a box spring, mattress, electricity, a lamp, and a nightstand in his room.

The children did not go to school when the parents had doctors' appointments, which occurred "definitely more than twice a week."[8] H.H. had not gone to school for three weeks before being taken into protective custody. There were incidents of domestic violence between the parents, but not in front of the children; father was twice arrested for domestic violence.

Prior to the instant proceedings, service agencies evaluated and diagnosed H.H. and R.Y.; agency personnel engaged in coaching, therapy, and counseling sessions at least three times weekly. They were placed on medications. At one point, both H.H. and

_____

[8] Mother wore prosthetics below the knees of both her legs. Mother was paid as a caregiver for father and R.Y.

12

R.Y. had been sent to a group home. However, the services were terminated before they were complete; mother begged them not to close services.

After services were terminated, mother was unable to obtain the children's medications. She repeatedly requested help from county agencies.[9] Mother told service agencies that she was locking H.H. and R.Y. in their rooms: "I felt . . . they said we were doing the best we could, and keep doing what we were told. That's exactly what they were trying to tell me since that's what we were there to address was the locks on the doors." The parents were trying to have H.H. removed from their home due to his behavior.

Mother had supervised visitation with minor for two hours, once weekly. "Well, a lot of our visits we actually—he'll get to choose where we go, and we have gone dirt bike riding. We have gone to the races out in San Bernardino, and we're always busy and doing something fun. So I always try to make sure that I have money just in case he gets hungry, or if there is any extra activities he is wanting to do. And then we were also doing visits at the park where I would run and play tag with him—well, I guess I wasn't really running, but the best of my abilities, I would try to play and do what I could to spend the time quality time with him that I could." Minor was happy when he saw her and sad when visits ended. She tried to talk with him on the phone every day. Mother loved her children with her "heart and soul."

---

[9] An acquaintance of mother testified that mother had reached out to the department numerous times for assistance.

Mother had engaged in several services, including parenting classes which "has given me a lot of—it has given me confidence, and I acquired a lot of skills to improve my relationship with my children." "I've learned to sit and be a good listener. I've learned to help them be able to work through whatever situations they have with them being able to be calm and not have their outbursts."

A social worker with the Department of Aging and Adult Services testified that his job consisted of assessing clients' physical and mental abilities and the areas in which they need help with their daily activities. Father and R.Y. were his clients between 2016 and 2019. He visited the parents' home twice a year. In 2018, R.Y.'s room "was bare. It had no carpet. It had a pillow and a blanket on the floor, which I was—it was reported to me was used to sleep on. The window was shut to where it could only open one inch, and that was done because she reportedly attempted to throw her mattress out of the window, so she couldn't escape." He made a referral to the department.

R.Y. had been removed in 2019 because it had been reported, "That she would physically harm herself, pulling out her hair. She would try to run away from the home . She would hit herself." It was reported R.Y. had been sexually abused by her biological father.

During mother's testimony, the court observed her repeated insistence on answering questions not asked of her, "It makes it look like you're trying to hide something or tailor something. It affects your credibility whenever you do that. So you can—you're not going to do that anymore, and if you do it, you have to understand the effect it has on the trier of fact. That it calls my attention to something that maybe my

14

attention wouldn't necessarily be—necessarily on. So that's at your own peril when you do that. I'm trying to explain to you, and all counsel, when a witness tries to do that, it is definitely a red flag as to credibility."

After testimony, the court noted: "Mother certainly paints a different picture than what the reports say. And I don't believe the picture that she has painted. I think she is still either in denial or is being deceitful when she testifies about certain things or, at least, minimizing to a great extent. Certainly shifting blame." "I think that is part of how [mother] survives mentally, maybe, is to shift the guilt and blame to somebody else."

The court sustained all the allegations pertaining to minor, took jurisdiction over him, and removed him from mother's custody. "And for the [section] [361.5, subdivision] (b)6 bypass, I would agree with the Department's assertion that in this instance the several years of locking the children, especially in the state they were found in the day of removal, when they were left at least five hours alone, locked in a room before [father] and [mother] came home, you know, I think that is indicative of what was always happening." "And so I think that was definitely cruel to where the children had to soil themselves or scream to be allowed to go to the bathroom, not have access to food like was needed. In an emergency situation, had there been a fire or a flood, they would not have been able to get out of that situation.

"I believe the facts as presented by [H.H.], and I do believe he was choked out to the point of unconsciousness as stated. I believe all of the things that he has reported in those papers, over Mother's assertions. Mother's assertions, again, have been self-serving, and only at some point when she was forced to talk about [domestic violence]

15

did she start to admit that." "I do not believe [father's] death removes Mother's risk to the children. Mother is clearly a risk to the children by her parenting styles and by allowing [father]—and, frankly, I think she was a part of it. So, you know, doing the locks and all of that, there's no doubt in my mind that this is severe physical abuse." The court found that although minor was "treated much better" "doesn't mean he is not at risk because he was exposed to all of these things going on in the house. He is equally at risk of severe physical abuse, in my mind, based on the totality of all of the evidence." The court denied mother reunification services and set the section 366.26 hearing. The court set visitation as one hour monthly.

On March 5, 2021, mother filed a notice of intent to file a petition for extraordinary writ. On March 25, 2021, this court dismissed the petition pursuant to a letter filed by counsel for mother indicating he had "determined there are no legal or factual issues upon which to base a Petition for Extraordinary Writ . . . ."

In the July 1, 2021, section 366.22 report, the social worker recommended the court terminate mother's parental rights to minor with a permanent plan of adoption. The PGPs reported that mother maintained consistent visits with minor; however, both minor and mother would become frustrated during visitation. Minor "could be disengaging and disrespectful to his mother during the visits." "It was reported that during the visits [minor] would speak to his mother as if he was speaking to a child, calling her descriptive names such as stupid or dumb. During telephone calls [minor] would hang up on his mother.

16

The PGPs had reported that minor exhibited defiant behaviors with them, especially the paternal grandmother, after the visits with mother. They reported it would take "a couple of days for [minor] to calm down and comply with their directives just to start all over again after each visit with the mother." The PGPs reported that minor's defiant behaviors had lessened; however, he continued to be disrespectful to mother. Minor reported, "he is ok with one time per month visit[ation] with his mother and that the visits with his mother are going well."

"The prospective adoptive parents ensure that [minor] is able to visit with his older siblings when he wants to either by phone or in person. [Minor] is well adjusted to his current placement as he understands this will be his forever home and has verbalized this to the [social worker]."

"The prospective adoptive parents want to adopt [minor] because they are his paternal grandparents and they want to keep [minor] in touch with his family and his heritage. As aforementioned, [minor] has indicated he is okay with being adopted by the prospective adoptive parents, his paternal grandparents, and does not wish to be adopted by anybody else." "The prospective adoptive parents have known [minor] his entire life . . . ." He "was placed with the prospective adoptive parents since January 15, 2020. There is a mutual attachment between the prospective adoptive parents and [minor]." He informed the social worker he sees them as parental figures.

"For fun the prospective adoptive family enjoys taking [minor] dirt bike riding, going to the movies, parks, having family time with their extended family, and having [minor] meet his extended family and develop relationships with them." "The

17

prospective adoptive parents are currently making [minor] aware of his heritage by having him connect with his extended paternal family. The prospective adoptive parents consistently speak with [minor] about the adoption and [he] understands he is being adopted. The prospective adoptive parents plan on meeting the social, medical, psychological, and financial needs of the child by having him immersed in the social structure of his extended family. This will enable the prospective adoptive parents to be able to raise [him] with the assistance of their extended family. The prospective adoptive parents continue to plan on having [minor] maintain contact with his biological mother on a regular basis. The prospective adoptive parents understand the legal and financial rights and responsibilities that accompany adoption and they understand they will become the legal parents of [minor]."

The social worker opined minor "is an appropriate child for adoption. The child is placed with a prospective adoptive family who is committed to [his] long term care. The child has been placed with the family for two years and the child and the family have developed a mutual attachment." The paternal grandparents "are dedicated to [minor] and committed to raising him to adulthood. It is recommended the [minor] be freed from his birth parents in order to be placed for adoption with" the paternal grandparents.

In an additional information to the court report, filed October 4, 2021, the social worker responded to a request from the court regarding visitation between mother and minor. The paternal grandparents reported visits occurred once monthly in various locations. Mother and minor kept "busy such as laser tag and bumper cars due to when they are together in quiet places like the park the mother tends to discuss the case which

18

triggers anger in [minor]. There is no set day that the visits take place as the PGP's work around the mother's work schedule. The PGP's explained that . . . disrespectful behaviors continue[] to be identified [such] as yelling, and talking rudely to . . . mother, and a challenge for the PGP's after the visits in dealing with his disrespectful behavior towards them. It is reported that [minor] understands the control he has over his mother and he manipulates her into buying him what he wants and she always follows through on purchasing whatever he asks for. The PGP's report that [minor] has weekly therapy to provide him with coping tools to help manage his emotions effectively and redirecting the disrespectful behaviors he exhibits. The PGP's ha[ve] also pointed out that [minor] is thriving academically with letter grade A in his subjects." Minor now reported that he wanted to live with mother.

The social worker explained to minor that department personnel were recommending adoption with the PGPs. Minor responded that "he understood and asked if he could return to playing with his game. [Minor] has adjusted to a certain lifestyle with his grandparents. He does not have to worry about his daily basic needs. He is thriving in school for the first time since the onset of this case. The PGPs [have] also reported that he has made significant improvement in therapy."[10]

In a November 12, 2021, additional information to the court report, the social worker reported, "On the last visit . . . [minor] indicated he wants to live with his mother and does not have an interest in Adoption . . . ." "Since May of 2021, [minor] has

_____

[10] The court appointed mother new counsel again on October 4, 2021.

19

become more opposed to the idea of adoption and has been advocating living with his mother full time." Minor "has been having visits with his mother supervised by the paternal grandparent prospective adoptive parents. Those visits have gone well but it has been noted the mother does talk about the case with [minor], which is redirected by the caregivers."

In an addendum report, filed January 27, 2022, the social worker noted that minor continued to have visitation with mother. "Immediately following the last court hearing the caregivers reported [minor's] mother began talking about the case with [minor]. The paternal grandparent prospective adoptive parents ended the conversation . . . and the mother and [minor] began discussing other issues. Since this time, the caregivers indicate [minor] and his mother have had very appropriate visits which have focused on their relationship rather than the case." "Overall, [minor] is doing well in the placement. He has confirmed if he cannot go home to his mother he wants to be adopted by his grandparents."

The social worker continued to believe adoption by the paternal grandparents was in minor's best interest. Even though minor did not suffer from the "harsh treatment" mother and father directed at his siblings, he did witness the physical abuse and the domestic violence between the parents. The social worker was concerned that minor could be subjected to the same abuse his siblings suffered if returned to mother. The social worker was concerned mother would "revert back to her past system of control by locking [minor] in his room for extended periods of time when faced with adverse behaviors she cannot control . . . ." The social worker believed minor was appropriate for

20

adoption. Minor had been "placed with the family for two years and [minor] and the family have developed a mutual attachment. [The PAPs] are dedicated to [minor] and committed to raising him to adulthood."

On February 2, 2022, the court held the section 366.26 hearing. Mother testified she had attended all visits with minor. Minor referred to her as "'Mom.'" Minor "tells me he loves me, and I am the best mom in the world." She tells minor she loves him. Minor is sad when visitation is over and tells mother "he can't wait to see me on my next visit, and he says that he will call me and let me know, you know, everything is okay and how school is going and try to update me on how his day was."

Counsel for the department argued "there's just nothing in the record that would show that it would be detrimental to sever the relationship between the mother and child. And, at this point, the minor deserves stability and permanency, which he has with his caregivers. For this basis, we are asking the Court to terminate parental rights and free the minor for adoption."

Mother's counsel argued, "Mother has testified as to her special and deep bond with her son, and I would ask the Court to find that the—under the parental-bond exception, . . . that it would be detrimental to sever the relationship at this time." Mother's counsel wished to preserve mother's ability to file a section 388 petition in the future.

Minor's counsel observed: "I have no doubt the minor loves his mom. He has indicated that to me numerous times; however, I do not believe there is a bond that would be detrimental if it is broken. I think it is more detrimental for the minor to think that he

may return to Mom." Minor's counsel further noted that "minor has told me if he can't go to Mom, he wants to be adopted, and I believe that's where we're at today. He cannot go to Mom, and, therefore, he should be adopted. He is generally and specifically adoptable, and, in my opinion, it's in his best interest to be adopted."

The court found minor adoptable. The court noted, "Mother's constantly visited—shifting over to her burden now. Mother has constantly visited. The visits are friendly visits, clearly. But there is a more defined standard. Will the child suffer a detriment by the adoption. So, you know, it is clear in the totality of the case, the whole history, the child's behaviors and things like that . . . . [I]t's clear that what's written there for me supplies the information that would say it would not be a detriment to sever the bond."

The court noted it was balancing minor's indication that he now wished to live with mother with everything else in the record: "I don't think that sentiment of love for the mother translates into detriment for the severance of the relationship. I understand the difference and emotions that are going on. But the question is whether . . . Mother's met her burden of proof. It's her burden to show that the child would suffer some detriment because of the severance. She has not met that burden." The court terminated mother's parental rights to minor.

## II. DISCUSSION

Mother contends the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of parental rights. Specifically, mother maintains that the court erred in not rendering a finding on whether minor would benefit from continuing his relationship with her which, in and of itself she argues, constitutes

22

reversible error. Mother asserts the court's finding of detriment was conclusory and, thus, problematic, as it bypassed the complex task set forth by *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) Thus, mother contends it is unclear whether the court considered prohibited criteria such as how much progress mother had made in her services and the adoptive parents' promise to allow mother and minor to continue visitation. We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have

23

maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The parties agree the court found that mother met the first element of the exception, regular visitation. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The court noted, "Mother has constantly visited." Substantial evidence supports the court's finding. (*Id.* at p. 640.)

Mother maintains the court committed reversible error by failing to render an express finding on the second element as to whether minor would benefit from continuing his relationship with mother. However, "we are aware of no requirement—and [mother] cites no authority supporting the proposition—that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 ["[A]lthough a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it [is] not a legal requirement in this instance."].)

Regardless, "[e]ven if the mother had established the existence of a beneficial parental relationship, she cannot show that the juvenile court abused its discretion in finding that the relationship between . . . mother and [minor] did not constitute a

24

'compelling reason' for finding that adoption would be detrimental to [minor]." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316-1317.)

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"What's more, understanding the harm associated with severing the relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse

25

of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"" [Citation.] But ""'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'""" (*Id.* at p. 641.)

The court acted within its discretion in declining to apply the beneficial parental relationship exception to the termination of mother's parental rights. The court acknowledged that minor loved mother and had expressed a desire to return to mother's custody. However, the court found that when weighed against minor's "behaviors" and "the totality of the case," mother had not met her burden of showing an exceptional circumstance or compelling reason that minor's adoption by the PGPs would be detrimental to him.

Although minor was never the direct object of any physical abuse, minor had witnessed the physical abuse of his siblings, domestic violence between his parents, and experienced the effects of attempts by father to commit suicide. Moreover, mother repeatedly tried to blame minor's siblings for all the problems in the house. It is difficult to see how any of this would not have negatively affected "'the strength and quality'" of the relationship between mother and minor. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

Indeed, the social worker's reports reflect several problems during visitation between mother and minor. In June 2021, the social worker noted that minor and mother would become frustrated during visitation. Minor "could be disengaging and disrespectful to his mother during the visits." Minor "would speak to his mother as if he

26

was speaking to a child, calling her descriptive names such as stupid or dumb. During telephone calls [minor] would hang up on . . . mother." In October 2021, the social worker noted that mother would discuss the case with minor during visitation which would trigger his anger; minor was disrespectful to mother, yelling and speaking rudely to her. Minor would exhibit defiant behaviors after visitation with mother.

Mother notes that she was minor's primary caretaker until he reached 10 years of age. However, the juvenile court had previously detained minor from mother's custody in another case. Thus, at the time of the hearing on termination of mother's parental rights, minor had already been twice detained from mother's custody. Moreover, the social worker noted there had been 51 referrals made on the household since June 2010. The social worker appropriately noted that there was a compelling need to provide minor with a stable home.

The prospective adoptive placement with the PGPs met minor's need for a stable home. The PGPs had known minor all his life. They had maintained a bond with minor during his entire lifetime. Department personnel placed minor with the PGPs on January 15, 2020. Thus, at the time of the hearing on termination of mother's parental rights, minor had been in the PGP's custody for more than two years.

The social worker's reports demonstrated that the PGPs had minor's best interest in mind. The reports reflected that minor was "thriving" with the PGPs. Minor was doing well in school for the first time; he had made significant progress in therapy. Minor had requested he be permitted to remain with the PGPs.

27

The PGPs facilitated visitation between minors and his siblings, something which mother had attempted to thwart. The PGPs arranged for minor to spend time with his extended family. Minor viewed the PGPs as parental figures. The PGPs were "dedicated to [minor] and committed to raising him to adulthood." Thus, mother failed her burden of proving that, on balance, the security of the adoptive home with the PAPs was outweighed by any detriment minor would suffer in having his relationship with mother terminated.

Mother complains about the paucity of information regarding the quality of mother and minor's relationship in the reports utilized by the court when making its decision. However, mother could have objected to the admission of the reports, requested supplements to address the issue, or called the social worker or PGPs to testify as to the quality of the visits. Mother did none of these things. As such, mother has forfeited any issue with respect to a contention that the reports were incomplete. (*People v. Seijas* (2005) 36 Cal.4th 291, 301 [a specific and timely objection must be made in the trial court on the ground sought to be urged on appeal].)

Mother also complains it is unclear whether the court considered prohibited criteria such as how much progress mother had made in her services and the adoptive parents' promise to allow mother and minor to continue visitation. However, the court never mentioned either of these factors when rendering its ruling. "'"We must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed."'" (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1161.) The juvenile court acted within its discretion in declining to

28

apply the beneficial parental relationship exception to the termination of mother's

parental rights.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:


MILLER

        J.


FIELDS

        J.